UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

TEMENOS ADVISORY, INC., and
GEORGE L. TAYLOR,

Defendants.

Case No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

the following against Defendants Temenos Advisory, Inc. ("Temenos") and its principal, George

L. Taylor ("Taylor"), and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1.      Temenos is a Connecticut-based investment adviser and Taylor is the majority

owner of Temenos and also holds several positions at the firm, including chief executive officer

("CEO").  From 2014 through 2017, Temenos and Taylor defrauded their advisory clients and

prospective clients by steering the clients into unsuitable investments and by hiding commissions

and other financial incentives that Temenos and Taylor were pocketing, on top of the advisory

fees that the clients were paying for supposedly unbiased financial advice. Temenos and Taylor

repeatedly downplayed or concealed risks, and overstated potential gains, associated with a

series of illiquid private placements that they advised their clients and prospective clients to

invest in.  In so doing, Defendants promoted the investments and pocketed commissions—a

percentage of each client's investment—from the private placement companies, thereby illegally acting as unregistered broker-dealers.

2.      Through their conduct, Temenos and Taylor violated the fiduciary duty that every investment adviser owes to its clients and prospective clients—to put client interests first, to deal with clients with the utmost honesty, to disclose all conflicts or potential conflicts of interest, and to use reasonable care in providing investment advice.  Instead, Defendants ignored their clients' interests and biased their investment advice to put money in their own pockets.  The advisory clients and other investors harmed by the Defendants included retail investors, and some of the harmed investors were senior citizens or individuals approaching retirement who invested money from their retirement funds or pension plans into the private investments recommended by the Defendants.

3.      In connection with steering clients into four private placement investments, Temenos and Taylor breached their fiduciary duty to advisory clients and prospective clients by:

- failing to perform due diligence commensurate with even minimal fiduciary obligations (such as reviewing full financial information and investigating the truth of claims made by the issuers);

- failing to disclose known defects that came to their attention, such as:  a company's poor financial condition, questionable spending practices, potential liabilities, misstatements and omissions in the companies' marketing materials, and dubious claims by one company about its technology;

- aggressively pushing advisory clients to invest in securities in which Temenos and Taylor had undisclosed conflicts;

- recommending investments that they knew, or were reckless in not knowing, were not suitable or appropriate for particular investors;

- grossly understating significant risks of investing in private placements generally;

- intentionally making numerous materially false and misleading statements and materially incomplete disclosures concerning the potential risks, returns, and value of particular private placements;

- failing to disclose Temenos's own failing financial condition;

- giving preferential treatment to a partial owner of Temenos (the trust for which Taylor served as trustee), by permitting it to redeem its principal investment in an illiquid investment (a privilege denied to other clients); and

- overcharging clients' advisory fees by overvaluing the private placement investments, in violation of Temenos's own written policies.

4.      Temenos and Taylor also played an extensive role in soliciting the private placement investments in exchange for commissions from the private companies.  In doing so, they illegally acted as unregistered broker-dealers when selling those investments.

5.      Through the activities alleged in this Complaint, Temenos and Taylor, while acting as investment advisers, have employed devices, schemes and artifices to defraud their investment advisory clients and have engaged in acts, transactions, practices and courses of businesses which operated as a fraud on their investment advisory clients, in violation of Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act").  Temenos violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder by failing to implement its written valuation policy.  Taylor aided and abetted that violation.  And, Temenos

and Taylor violated Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") by inducing and attempting to induce the purchase and sale of securities without being registered as a broker or dealer or being associated with a registered broker or dealer

6. The Commission seeks:

a. entry of appropriate permanent injunctions, including an injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws;

b. disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest; and,

c. imposition of civil penalties due to the egregious nature of Defendants' violations.

## JURISDICTION AND VENUE

7. The Commission seeks a permanent injunction and disgorgement pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]. The Commission seeks the imposition of a civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

8. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa] and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

9. Venue is proper in this District because, at all relevant times, Temenos and Taylor operated as investment advisers and served advisory clients in Connecticut. In addition, the acts, transactions, practices, and courses of business constituting the alleged violations occurred in Connecticut.

10.    In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

11.    Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

12.    **Temenos Advisory, Inc.** is a Connecticut corporation founded by Taylor with its principal place of business in Litchfield, Connecticut and additional offices in St. Simons Island, Georgia, and Scottsdale, Arizona.  Temenos has been registered with the Commission as an investment adviser since 1999, and is owned by George Taylor and a trust that was set up for the benefit of Taylor's former business partner.

13.    **George L. Taylor**, age 62, is a resident of Litchfield, Connecticut.  Taylor is the CEO, founder, Chief Compliance Officer, and majority owner of Temenos.  Taylor is also a registered representative of a broker-dealer that is not affiliated with Temenos.  Taylor is registered as a General Securities Representative, a General Securities Principal, an Investment Company Products/Variable Contracts Principal, and a Uniform Securities Agent with the Financial Industry Regulatory Agency.

## STATEMENT OF FACTS

**A. Defendants Took Money to Recommend the Securities of Private Placement Companies, and Did So Without Conducting Adequate Due Diligence**

14.    Before 2014, Temenos and Taylor had invested their advisory clients' money primarily in mutual funds, exchange traded funds, variable annuities, and publicly traded stocks. They charged an asset management fee to their clients based on the clients' total assets under their management.

15.    Starting in 2014, Temenos and Taylor began actively recommending the privately offered securities of four private companies to Temenos's clients and prospective clients. Between 2014 and 2017, Defendants placed more than $19 million in investments by their clients and others in these four private issuers' securities.  And they did so without ever sufficiently examining the marketing claims, financial statements, or the business activities of those companies.

16.    Critically, by steering their clients' investments into those securities of the four private companies, Temenos and Taylor arranged to covertly collect commissions (a percentage of the amount invested) on top of the asset management fees their clients were already paying for unbiased advice.  Although their due diligence was inadequate, their financial incentives to recommend these private securities offerings were not.

**1. Temenos and Taylor Agreed to Commission-Based Solicitation Agreements with Private Placement Companies**

17.    Defendants recommended their clients invest in the securities offerings of at least four private companies:

6

18.     **Company A** marketed an emergency response communications product. Beginning on or about April 25, 2013, Company A engaged in a private placement securities offering.

19.     Temenos and Taylor solicited investments in Company A.  Between February 2014 and February 2017, Temenos solicited approximately $11.2 million of investments in Company A from their advisory clients and other individuals (certain of whom later became advisory clients of Temenos).  From September 2014 through February 2017, pursuant to a "Finder's Engagement" agreement with Company A, Temenos solicited investments in Company A as its "finder."  From October 2014 through February 2017, Company A compensated Temenos for Temenos's role in the private placement.  Temenos, at Taylor's direction and under his signature as CEO, entered into a "Finder's Engagement" with Company A, effective September 1, 2014.  Under that agreement, Temenos received money equal to 2.5% of each investment it brought to Company A.  On September 9, 2015, Temenos and Company A extended that agreement and changed the compensation that Temenos received.  Under the extended agreement, Temenos received 5% of each investment it brought to Company A.

20.     **Company B** purported to be building a fiber optic connection between locations along the east coast of the United States.  Beginning on or about January 15, 2015, Company B engaged in a private placement securities offering.

21.     Temenos and Taylor solicited investments in Company B.  Between September 2014 and March 2017, Temenos solicited approximately $7 million of client investments in Company B.  From January 2015 to August 2015, Temenos solicited investments in Company B through a solicitation arrangement with an intermediary.  Temenos, at Taylor's direction and

under his signature, entered into a "Non-Exclusive Placement Agency Agreement" with Company B effective August 1, 2015.  Under that agreement, Temenos received a fee equal to 5% in cash and 5% in equity (that is, an ownership stake in Company B) of each investment brought to Company B.  From September 2015 through February 2017, Company B compensated Temenos directly for Temenos's role in the solicitations.

22.     **Company C** marketed itself during the relevant time period as a crowdfunding investment portal.  Company C's founder and president is a former registered representative of a broker-dealer.   Prior to founding Company C, he owned a company that had a solicitation agreement with Company B.  Company C employs Taylor's wife as Managing Director, Customer Experience.  Prior to that, she served as Principal Director of Investor Strategies.  She received stock options in Company C as part of her compensation.  For a short time, Defendant Taylor served on Company C's investment committee.  Beginning on or about March 18, 2016, Company C engaged in a private placement securities offering.

23.     Temenos and Taylor solicited investments in Company C.  Between March 2016 and January 2017, Defendants solicited $805,000 of client investment in Company C.

24.     In the meantime, shortly after Temenos and Taylor began soliciting investments in Company C from their clients, Temenos and Taylor began to receive undisclosed payments from Company C.  On July 6, 2016, Company C's CEO confirmed that Temenos would receive a fee equal to 7% of each investment it brought to Company C in cash, and 5% more in Company C equity.  On July 15, 2016, Company C offered Taylor an additional financial incentive to solicit investments, promising Taylor an additional 25,000 options on purchasing Company C stock once Defendants had successfully solicited $500,000 of investments for

Company C.  The email between the CEO and Taylor acknowledges that Temenos would have Temenos's advisory clients invested in Company C, and that Taylor would also be marketing Company C to non-clients as well to people "beyond [Taylor's] own contacts."  From August 2016 through December 2016, Company C compensated Temenos for Temenos's solicitations. In December 2016, Temenos, at Taylor's direction and under his signature, entered into a "Finders (sic) Agreement" with Company C, retroactively effective as of February 10, 2016. Under that agreement, Temenos received money equal to 7% of each investment it brought to Company C.

25.      **Company D** purported to have developed a new water purification technology. In or around early August 2015, approximately one month after two of the three Temenos advisory clients who invested in Company D had completed their investments, the owners of Company D's parent company fired Company D's president, and withdrew all the money from Company D's checking account.

26.      Temenos and Taylor solicited $225,000 of client investments in Company D. From in or about December 2014 to in or about July 2015, Temenos, through Taylor, solicited investments in Company D.  Taylor expected that Company D would pay Temenos a 5% finder's fee for investments in Company D from Temenos clients.

**2.  Despite Their Representations, Defendants Failed to Conduct Even the Basic Due Diligence Necessary to Determine Whether the Private Placement Investments Were Suitable for Its Clients**

27.      Throughout the relevant period, Taylor made statements to clients that misleadingly suggested that the private placement investments Temenos offered had been carefully vetted and selected from a large group of potential offerings based on their favorable

risk/return potential, and were suitable for any wealthy investor.  They weren't.  Defendants did

not perform adequate due diligence before recommending that advisory clients invest in the

private placement companies.  Instead, they recommended those investments without even the

most basic information on the companies necessary to judge the risks and rewards of those

investments and with a reckless disregard for the truth of their statements about those

investments.

28.     Defendants repeatedly represented that they had performed due diligence on the

private placement investments and that the investments were suitable for their clients.  For

instance:

a.      In emails sent to clients and other prospective investors in December 2014, May

        2015, and December 2015, Taylor wrote, "We are fortunate to see many

        opportunities in the private equity space.  We try to select those which are lower

        risk (all private equity is risky), those which exhibit exceptional return potential

        and those which are helping to make our country a better place."

b.      On May 7, 2015, Defendants emailed numerous advisory clients and others

        soliciting them for an investment in Company B informing clients that Temenos

        sees many opportunities to invest in private companies and tries to select those

        which are lower risk, exhibit exceptional return potential, and help make the

        country a better place.

c.      In a December 2016 email to advisory clients and others, Taylor stressed that all

        of Temenos's private issuer securities offerings "have strong management teams

        and compelling business models."

      d.      In a February 2017 email to advisory clients and others, Taylor stated, "we don't recommend every investment that we have access too [sic] . . . we have a process of due diligence and vetting."

In making these claims about the selection of investment opportunities, Defendants failed to notify investors that, in fact, they had not independently assessed the risk or return potential of these companies.  Moreover, Defendants omitted to mention a key selection criterion for the private companies in question—the willingness of those companies to pay Taylor for every client dollar steered to those companies.

      29.      Defendants recommended advisory clients and prospective clients invest in these private companies without doing sufficient due diligence to determine the risk of those investments, the financial stability of those companies, the business prospects of the companies, or the suitability of the investments for particular clients.  They forwarded emails from these companies to their advisory clients and prospective clients without performing even minimal due diligence, without adequate effort to determine the accuracy of the representations they were sending to advisory clients, and with reckless disregard for the truth of those representations. For instance:

      a.      Defendants did not review financial statements for Company B prior to touting Company B to clients and prospective clients.  Defendants began placing client funds into Company B in January 2015, well before they ever saw Company B's financial information.  When, much later, in July 2015, Defendants saw full financial information about Company B, they discovered that Company B did not

have enough money to build the fiber optic line it claimed to be building, and was using most of its money for marketing instead.

b.     Defendants failed to discover and/or disclose that, between March 2015 and March 2016, several lawsuits were filed against Company B and that Company B lost control of a key land parcel, which significantly jeopardized Company B's ability to build its fiber optic line;

c.     Defendants did not conduct due diligence on Company C before recommending their clients invest.  Instead Defendants relied only on their uninformed, subjective opinion that Company C had good legal counsel and a good compliance firm.

d.     Defendants' due diligence on Company D was limited to reading the company's business plan and sending that information to a couple of Defendants' clients who were engineers.  One of those engineer clients bluntly notified Defendants that Company D's technology was "a bunch of crap."  Taylor also declined an invitation from Company D for Taylor to visit the Company D facility and view its technology.

e.     On June 28, 2015, Taylor emailed a prospective investor, unreservedly recommending an investment in Company D and asking for more investment money based on his great results.  Without having conducted due diligence on the company, Taylor wrote that, "… by July they will be increasing the value of the company from 10 million val[uation] to $100 mill[ion]" and represented that the company would sell every unit they make and become a dominant "industry

12

disruptor" that would be an "$8 billion business."  Taylor also stated that the odds
were "[o]ver 60% that technology will work as claimed" and "[i]t succeeds you
will get at least 10 to 25 times your investment…."  He had no basis for either the
supposed calculation of the odds the technology would work or for the expected
return on investment if it did.

30.     Defendants also disregarded negative information contained in the financial
statements of some of the private companies, and failed to disclose this negative information to
advisory clients or prospective clients when they solicited them to invest.  For instance,
Defendants knew that Company B had been rapidly using up its available cash and may be
facing insolvency, but nevertheless recommended their clients invest in Company B and
collected its resulting commissions.

31.     Defendants failed to corroborate the claims they later made to advisory clients and
others about the private placement companies.  Defendants did not obtain sufficient information
to determine the merits and suitability of the private companies as investments they
recommended to their advisory clients and prospective clients.  Nor did they corroborate the
information they received from the private placement companies in connection with their
provision of investment advice.  Instead, in many cases, Defendants blindly forwarded and/or
parroted information received from the private placement companies.  Defendants failed to
exercise reasonable care, failed to conduct sufficient due diligence, failed to make an
investigation that would provide them with a reasonable basis to believe their representations
about the private placement companies were true and accurate, and failed to obtain the

information necessary to determine whether the investments were suitable for their current and prospective advisory clients.

>    **3.  Defendants Failed Adequately to Inform Clients that They Were Getting Paid by the Recommended Private Placement Companies, On Top of the Clients' Advisory Fees**

32.     Though they were actively engaged in, and compensated for, soliciting investments in the private placement companies, prior to March 31, 2015, Temenos did not disclose to its advisory clients that it received compensation from the private placement companies.  Registered investment advisers are required to file with the Commission a document called the Form ADV, which is a uniform form used to register with the Commission or, in some instances, a state securities regulator.  Form ADV contains a variety of disclosures about the adviser and its advisory business that must be updated at least annually.  Temenos's Form ADV Part II, dated March 26, 2014, makes no mention of private placement or private equity investments.  Beginning in March 2015, Temenos included a generic disclosure in its Form ADV about the possibility that it might receive "finder's fees" for private equity investments. Temenos's Form ADV Part II, dated March 31, 2015, states, "[w]e have and may receive finder's or consulting fees for recommending certain private placements or private equity deals. Typically these are only done with accredited investors whom we decide these types of investments are suitable for."  In its Forms ADV Part II, dated January 15, 2016 and March 31, 2017, Temenos provided slightly more disclosure, stating that: "We may get paid a finder's fee or consulting fee for offering these type of [private] investments to our clients ….  Our compensation will vary, but typically has ranged from zero to 10%.  This could include cash or stock compensation."  Temenos's Form ADV Part II general disclosure about the possibility of

receiving compensation was, at best, a half-truth, failing to alert clients that Temenos and Taylor were pocketing commissions when they put clients into particular private offerings, even while the clients were paying advisory fees.  Such general disclosures were insufficient to enable clients to make an informed decision on whether to invest in a particular security, or to retain Temenos as an adviser.  While after March 31, 2015, Temenos had generally disclosed that it "may" receive a finder's or consulting fee, it failed to tell clients and prospective clients that it, in fact, was routinely receiving fees for investments in the private placement offerings and that the fees were many times larger than the advisory fees the clients were paying for advice.  Nor did Temenos notify clients when Temenos and/or Taylor were being compensated by receiving ownership interests in the companies, and what effect that conflict of interest had on Temenos's investment advice.

33.     In particular, Defendants repeatedly failed altogether to tell clients that Defendants were getting paid by the private companies at the times when Defendants were soliciting and investing clients' funds in those companies' offerings.  For instance, on March 6 and 19, 2015; May 7 and 23, 2015; June 23, 2016; August 2, 2016; November 25, 2016; and December 27, 2016, Defendants sent emails to numerous advisory clients and other prospective investors soliciting investments in Company B.  These emails did not disclose that Temenos expected to receive as compensation from Company B a percentage of the amount invested, nor was this information disclosed to those who expressed interest in the investments.

34.     The disclosures Defendants did make were incomplete and misleading.  For example, on December 10, 2014, Defendants disclosed to approximately 35 advisory clients that Temenos would receive as compensation 3% of the amount invested in Company B.  Numerous

additional prospective investors received only later emails, which did not contain any such

disclosure. By August 1, 2015, Temenos's compensation from Company B had increased to 5%

of the amount invested, but Defendants did not disclose the increase, even to those who had been

told about the 3% fee. Nor did Defendants later disclose this information to clients who they

recommended invest in Company B.

35.     On August 15, 2015, Defendants emailed numerous advisory clients and others

soliciting investments in Company A. This email did not disclose that Temenos expected to

receive a percentage of the amount invested in Company A from Company A as

compensation. On September 23, 2015; November 19, 2015; December 4, 2015; January 13,

2016; April 22, 2016; May 16, 2016; June 20, 2016; August 17, 25, and 31, 2016; September 30,

2016; October 17, 2016; November 25, 2016; December 27, 2016; and January 10, 2017,

Defendants sent additional emails to numerous Temenos advisory clients soliciting investments

in Company A. None of these emails disclosed that Temenos expected to receive as

compensation a percentage of the amount invested. Nor did Defendants later disclose this

information to clients who they recommended invest in Company A.

36.     On August 2, 2016; September 19, 2016; October 18, 2016; December 27, 2016;

January 23, 2017; and January 26, 2017, Defendants emailed numerous advisory clients and

others soliciting investments in Company C. Several of these emails attached Company C

marketing materials. Defendants did not disclose that Temenos expected to receive as

compensation from Company C a percentage of the amount invested in Company C. Nor did

Defendants later disclose this information to clients who were considering investing in Company

C.  The January 23, 2017 email also disclosed that the CEO of Company C was associated with Temenos, but inaccurately referred to him as an "SEC advisor."

37.     Defendants failed to disclose several other actual or potential conflicts of interest to clients and potential clients when recommending investments in the private offerings.  For instance:

     a.     Defendants did not disclose to clients that both Temenos and Taylor, personally, were under financial stress and were struggling to meet operating expenses when they recommended that clients invest in securities for which they received, as compensation, a commission based upon the amount invested.

     b.     Defendants did not disclose their expected ownership interests in Company B or Taylor's expected ownership interests (or, for certain clients solicited at the end of 2016, Taylor's wife's ownership interests in the form of equity options) in Company C when advising their clients about Company B, Company C, or Company C-related investments, when soliciting their clients for investment in Company C, or when recommending their clients invest in securities offered through Company C's crowd-funding platform.

     c.     Defendants did not disclose that Taylor had become actively involved in helping the management of Company B as a member of Company B's Finance Committee, and, for a time, was part of an "advisory committee" for Company C.

38.     By failing to disclose this information to advisory clients and prospective clients who were solicited to invest in these companies, while holding themselves out as investment

17

advisers, Defendants intentionally made fraudulent misrepresentations and material omissions to those clients and prospective clients.

### 4. Defendants Improperly Placed Clients in Unsuitable and Highly Risky Investments

39.     Defendants recommended the private placement company investments to *all* of their investor clients who they believed to have sufficient income, regardless of whether those risky investments were right for a particular client.  They emailed numerous advisory clients, recommending that clients invest in the private companies' securities, without concern for the clients' personal circumstances or risk tolerance.  For example:

    a.    In June 2016, Taylor told over 100 clients by email that, "[m]utual funds and separate accounts are expensive and inefficient. . ." and "[w]ith our accredited investors, private equity is a key component to increase potential return and to decrease overall risk."

    b.    On February 13, 2017, Defendants sent a mass email to Temenos clients stating, "[w]e believe that wealthy investors should have some private equity investment…." and, "[i]ncluding more and different types of private equity companies increases the odds that one will be successful in this asset class – as in all others."

Defendants should not have been soliciting from their entire client base to invest in the private companies' securities—investments which were inherently high risk and illiquid with a long-term and indefinite time horizon.

40.     Defendants continually recommended these private placement investments to specific advisory clients and prospective clients regardless of the suitability of the investments

for that client.  For several clients whom Defendants convinced to invest in those private placement offerings, those investments were wholly unsuitable when considering the clients' inability to tolerate the risk of losing money on the private placement investments and when considering the time by which the clients would need to liquidate their investments to use the invested funds.  For instance, Defendants placed two-thirds of one particular client's retirement funds into private placement investments.  This client, a 52-year-old woman with a risk averse investment approach, had transferred to Temenos all of her retirement funds (approximately $350,000), which had previously been invested in a diverse portfolio of mutual funds and publicly traded common stock.  Defendants advised her to sell most of those investments in order to invest in three of the private placement investments.  Taylor told the client that the investments would earn her a higher rate of return for the fifteen years she planned to continue working.  The client knew the companies she had invested in were not yet publicly traded, but did not understand the risks associated with investing in private placements.  Defendants did not explain to her that these private placements were higher risk investments than those she had.  Defendants also did not tell the client that Taylor's wife worked for one of the recommended companies, or that Defendants would receive commissions from the private placement companies for her private placement investments.  Taylor also falsely told the client that the Company A private placement was a two-year commitment when he actually had no way of knowing whether the investor would have an exit opportunity at the end of two years.

    41.    In another example, Taylor convinced an elderly widow to invest at least $350,000 of her retirement funds in the four private placement companies, within three months of her husband's death.  The woman's husband had previously handled all of the couple's

finances and, with the exception of a $100,000 investment in Company A, the couple's assets had been invested entirely in mutual funds, variable annuities, and common stock of publicly-traded companies prior to the husband's death.  In less than two years after her husband's death, Taylor convinced this widow to invest 34% of her total assets managed by Temenos in risky private placement investments.

42.     At other times, Defendants greatly understated the risks of investing in these private placement investments.  On March 20, 2015, Taylor wrote to a prospective investor, "I know that you are not swimming in current cash flow but [the Company B] investment that (sic) we can do is god (sic) as it gets. . ."  Taylor stated that the estimated return over five years was 20 times the invested amount, and suggested the client use more of their IRA retirement savings to make the investment.

43.     Defendants determined that, based on the questionable technology involved, Company D was a high-risk investment, and invested funds from three clients in Company D's offering.  Taylor treated these three investors as investors with what he termed "off-the-charts" risk tolerance who would "do anything" in terms of investments.  In so doing he ignored that one of these investors had specifically told Taylor she was a conservative investor, and another had been recently widowed and was reliant on her investments for living expenses.

### 5.  Taylor and Temenos Acted as Unregistered Broker-Dealers

44.     Taylor and Temenos solicited their advisory clients and others to invest in certain private securities offerings.  In each case, Temenos and Taylor either directly or indirectly received compensation from these issuers based on their sales activities equaling a percentage of each sale.  And, in several instances, Defendants also received, directly or indirectly, stock

compensation (that is, an ownership interest in the companies they promoted) for their sales efforts.

45. In these solicitations of investments in the private placement companies, Temenos and Taylor each illegally acted as a broker. That is, their activity went well beyond bringing two parties together and passively awaiting the possible consummation of a transaction. Instead, Defendants received commissions on the investments they brought in; actively promoted the securities of the private placement companies; and actively, rather than passively, found and solicited investors.

46. Defendants, acting as unregistered brokers, used marketing emails to actively recruit potential investors to invest in the private placement securities Taylor promoted, including in emails to numerous advisory clients and others on May 7, 2015 (soliciting for Company B) and on August 2, 2016 (attaching marketing materials including an executive summary and marketing slides produced by Company C). While Defendants' advisory clients were paying for prudent investment advice tailored to their individual needs, Defendants' emails employed classic "hard sell" tactics, creating a sense of urgency by indicating that offerings were close to fully funded, and/or that prices were about to increase, and/or that the time for buying at a specified price was limited. In other words, Defendants' advisory clients were paying for someone to guide them and put their interests first; what they got was a salesman putting his own interests first without disclosing his pecuniary interest in doing so.

47. Defendants also promoted and facilitated the private placement investments by providing potential investors with subscription agreements, business plans, and securities

offering memoranda.  For example, on August 8 and 9, 2016, Defendants sent Company C's

subscription agreements to prospective investors for signature.

48.     Defendants also touted the merits of investing in these securities, telling their

clients (without basis) about the potential for returns and the likely timetable for achieving those

returns.  For example:

    a.      On November, 19, 2015, Defendants emailed numerous advisory clients and

           others touting investments in Company A, describing the company's product as

           "simply the best and only solution," telling investors they would not be locking up

           their money for a long period of time and describing its risk/return ratio as an

           investment as "great."

    b.      On June 20 and August 16, 2016, Defendants emailed dozens of prospective

           investors soliciting investments and opining that Company A continued to be one

           of the lowest risk, highest return investments available.

    c.      In an August 4, 2016 email to a prospective investor in Company A, Taylor

           detailed why he believed Company A to be a "uniquely promising investment"

           adding that rarely in his career had he been as excited about an offering.  Taylor

           stated that it was the opinion of Temenos that Company A's business would be

           worth $3 to $5 billion over the following couple of years.  Taylor also opined that

           Company A would be sold for $1 to $3 billion dollars, and if that happened

           investors would make 10 to 30 times their investment.  Taylor made these same

           representations to investors by emails dated August 16, 25, 27 and 29.

d.      In a January 24, 2017 email to an advisory client who asked about the potential return on Company C, Taylor responded, "5 year hold.  *10x.*"

49.      Temenos assisted in effectuating the transactions by collecting signed documents and checks from investors and forwarding them to the issuers and by issuing wiring instructions to transfer clients' funds to issuers.  For example,

a.      On April 1, 2015, Temenos sent a subscription document for an investment in Company B to a Temenos advisory client for signature, and provided wiring instructions.

b.      In June 2015, in connection with a Temenos advisory client's investment in Company D, Defendants collected from their client a personal check made payable to Company D, and forwarded it to Company D.

c.      On April 29, 2016, in connection with a Temenos advisory client's investment in Company A, Temenos sent the client's signed wire transfer request to the firm that maintained the client's brokerage account, instructing that $50,000 be wired from the client's brokerage account to Company A's bank account.

d.      On August 16, 2016, in connection with a Temenos client's investment in Company C, Temenos sent a wire request to the custodian of the client's account, requesting the transfer of funds to Company C's bank account.

e.      On August 8, 2016, a Temenos employee even offered to pick up the executed subscription agreement and a check made out to Company C.  The Temenos employee made the same offer to another Company C investor on August 9, 2016.

50.     Temenos and Taylor received transaction-based compensation for their services to Companies A, B, and C, each of which paid Temenos fees based on a percentage of the capital commitments made by the investors Taylor brought to them.

51.     In soliciting investments in the private placement companies, Defendants acted as unregistered broker-dealers.  During the time period when Defendants were soliciting investments in the private placement companies, Defendants were not registered with the Commission as broker-dealers.  Nor were they associated with a broker-dealer that was overseeing their solicitation efforts, or otherwise qualified for an exemption or safe harbor provision concerning their activities as broker-dealers.

### 6.  Defendants Made Fraudulent Misrepresentations and Omissions in Private Placement Solicitations

52.     Defendants made several misrepresentations and fraudulent omissions about the private placement companies to advisory clients and prospective clients.  For instance:

a.     On August 2, 2016, Taylor emailed approximately 150 current and prospective advisory clients touting Company B's "long term contracts" with Verizon, Amazon and AT&T. These contracts did not exist.

b.     On October 18, 2016, Taylor emailed over 250 current and prospective advisory clients notifying them of Company C's impending website launch.  That same day, a Temenos client replied to Taylor's email, asking, "And what is your commission on that one?"  Taylor responded, "i don't get commissions" [sic], despite the ongoing arrangement that Temenos had with Company's C's CEO to receive a fee equal to 7% of each investment it brought to Company C in cash, and 5% more in Company C equity.

24

c.   In a November 19, 2015 email to over 140 recipients, including current advisory clients, Taylor falsely represented that the last three Boston Marathons had used Company A's product, suggesting that the product had been used at the time bombs were placed on the marathon route in 2013. Taylor also repeated Company A's assertions about a partnership with a particular technology company, and also represented that Company A's technology was being used by several other specified technology companies, without any attempt to verify these claims before repeating them to his clients.

53.   In July 2015, Defendants learned that Company B had large off-balance sheet liabilities, as well as significant debts and expenses. Also, during this time Taylor served on Company B's Finance Committee, as an uncompensated adviser to Company B. Defendants intentionally failed to disclose either their conflicts or Company B's financial difficulties to advisory clients who had already invested in Company B or to clients and prospective clients that they solicited to invest in Company B.

54.   Later, on or about August 1, 2015, Temenos entered into a solicitation agreement giving Temenos both money and Company B equity in exchange for investments. Specifically, Temenos expected to receive a fee equal to 5% of each investment in cash, plus 5% of each investment in shares of Company B. Taylor did not disclose that arrangement to his advisory clients who were current or prospective investors in Company B.

55.   Soon after, Defendants successfully assisted in soliciting a new investor for Company B. At that time, Taylor had seen the complete Company B financial statements, and knew the full extent of the financial difficulties Company B was then experiencing.

Nevertheless, Defendants advised additional Temenos advisory clients to invest, without disclosing Company B's perilous financial condition and without disclosing Defendants' compensation agreement with Company B.  Taylor's failure to disclose Company B's dire financial condition to his advisory clients and prospective clients was no accident.  Indeed, Taylor entered into an explicit non-disclosure agreement with Company B, as part of his arrangement with Company B, which Taylor understood would prevent him from disclosing to clients Company B's poor financial condition.  In so doing, Taylor intentionally placed Company B's and Defendants' interests above those of Defendants' advisory clients, in violation of Defendants' fiduciary duty to those clients.

56.     Defendants knowingly provided outdated and inaccurate materials and information about Company B to their advisory clients and prospective clients.  Those materials did not describe Company B's dire financial condition or the many lawsuits in which Company B was involved.  By May 4, 2016, Company B had created a 2016 business plan, which noted several important negative developments such as: Company B's significant net losses since inception; its millions of dollars of debt; the various legal proceedings and claims against Company B, asserting millions of dollars of claims against it; the inexperience of Company B's management team in the telecommunications or data center industries; and Company B's inability to produce audited financial statements, which prevented it from filing federal and state tax returns for 2012, 2013, and 2014.  Instead of providing clients with the *2016* business plan, Defendants provided advisory clients and prospective clients with Company B's *2015* business plan, which did not include those disclosures.

57.     Between March 2015 and October 2015, Taylor advised and solicited an advisory client to invest in Company A and Company B.  Taylor, on multiple occasions, promised the investor, the investor's spouse, the investor's mother, and their family's company's pension plan a return of twenty times their investment on both the Company A and Company B private placements.  At no time did Defendants disclose the extent to which Taylor expected to receive, and already had received commissions for their Company A and Company B investments.  The investor had repeatedly told Taylor that he and his family members did not have a long "time horizon" for their investment (that is, they would need access to the money in the near future).  But Defendants nevertheless recommended these illiquid, long term investments, including for the investor's 85-year-old mother.  On Defendants' advice, the investor and his wife proceeded to invest half of all of their investment funds, including 95% of their retirement funds, into the Company B private placement.  The investor's mother and the Company's pension plan also invested in Company B.  The pension plan also invested in Company A.  Taylor did not provide the investor and his wife with financial information regarding the companies prior to soliciting their investment, but did provide them with documents to sign in order to complete the purchases.  Defendants did not explain the documents they asked the investors to sign and failed to explain how the investment deviated from the investors' stated time horizon, but pushed the investors to sign nevertheless.

58.     Temenos and Taylor repeatedly solicited funds for the private placements with emails (often to hundreds of recipients) that contained blatant misrepresentations and baseless performance forecasts, used high-pressure sales tactics, and blindly repeated claims from the private placement companies.  For example:

a.    On September 30, 2016, Taylor emailed over 200 advisory clients and others
      falsely touting the use of Company A software by three applicants for a contract
      with an independent authority within the U.S. Department of Commerce,
      including a specified large communications company.  The email represented that
      the investment opportunity was available for a limited time only, urging, "time is
      running out, so move quickly if you want to participate."  Taylor further pressed
      clients to refer additional prospects to Defendants, stating, "[i]f you know
      someone who is an accredited investor and might be interested, we can email an
      NDA to be signed.  We are looking for initial investments of $100k."  That same
      day, a Company A board member who received the email alerted Taylor that it
      was inaccurate, because the companies mentioned in the email were not yet using
      Company A software.  Despite being expressly informed of the falsity of their
      representations, Defendants failed to correct them.

b.    On August 2, 2016, Taylor emailed over 100 advisory clients and others touting
      the false representation that "all the big players …. are backing [Company B] with
      long term contracts," (specifying those "big players") and adding, "We only have
      available a limited number of shares for sale at the original price of $85.29 per
      share . . . this offer will be short lived."  This representation by Taylor was false
      and misleading.  In fact, Company B did not have contracts with at least three of
      the four "big players" mentioned, and Taylor took no steps to verify whether any
      of the contracts actually existed.

c.      On December 7, 2015, Taylor emailed an advisory client stating, "[t]he good news with Company A is you are getting at least 74% return if sold late next year and more closely close to 9X or 10X if sold at $1 billion which is what I think they will sell for."   In doing so, Defendants made fraudulent omissions to the client by making it appear that there was actual analysis behind these very specific figures.  In fact, Defendants had no basis for these statements.

### 7.   Defendants Failed to Disclose to Advisory Clients Their Dire Financial Situation, Which Influenced Defendants' Recommendations of the Private Placement Companies

59.     Despite being required to do so in Temenos's Form ADV, Defendants did not disclose their dire financial situation to their advisory clients.  In concealing this fact, Defendants fraudulently omitted both the risk that Temenos would not be able to fulfill its investment advisory agreements with its clients, and the significant undisclosed conflicts of interest in its recommending the private placement investments for which it received a substantial and immediate influx of cash.

60.     From approximately August 2014 to February 2017, Temenos and Taylor were in severe financial distress.  This condition interfered with Defendants' ability to provide disinterested investment advice to their advisory clients and risked threatening the continuity of Temenos's business operations, yet Defendants did not disclose their dire financial situation to advisory clients.

61.     During this time, Defendants had frequent overdue or unmet payrolls, unpaid commissions to Temenos employees, numerous unpaid bills including unpaid employee health

insurance bills, extremely low or overdrawn bank account balances, and the possibility of power, telephone, and internet service being shut off for non-payment of bills.

62.     Taylor's personal finances were also strained, which in turn threatened Temenos's financial situation as Taylor frequently withdrew money from Temenos's financial institution account to pay for personal expenses.  Taylor often had difficulty paying his personal bills, including his gas, power, and private school tuition bills, but still routinely engaged in excessive personal spending.

63.     Taylor and other Temenos employees explicitly tied the aggressive solicitation of clients for private placement investments (of which Temenos would receive a fee based on a percentage of the amount invested) to Defendants' dire financial situation.  Taylor frequently discussed the need to get investors to agree to sign and return private placement subscription agreements in order to have the funds to make payroll and pay other overdue bills.  For instance:

a.      On August 27, 2014, Taylor sent an email to the president of the broker-dealer firm with which he was associated, expressing his urgent need to receive any outstanding commissions.  Taylor went on to say, "I am working on [a Temenos client] which will be at least $25k [in commissions] … I have recommended he add another $1 million.  The sooner the better."

b.      On October 23, 2014, Taylor wrote to another Temenos employee, "We need to get [Company A] finalized by Monday. . . I have [been scrambling] to get money today for health insurance $9k[.]  We have [Company A] money being sent to us[.]  We need to get all the money to [Company A] …they pay 10 days after all the money and paperwork is in so we need to get everything finalized as soon as

possible. . .  I guess we are not doing [another private issuer investment] today but we should do as soon as possible[.]"

c.   On March 19, 2015, when Temenos and Taylor owed $10,780 for home and office heating and propane, Taylor emailed advisory clients with the subject line "Company B new business plan Urgent" falsely stating that the price of a Company B new offering would be increasing by 780% on April 1, 2015 but Temenos customers could get in at the old price of $1,000 per share if they could return signed paperwork in less than a week.  The email worked:  between March 19, 2015 and April 8, 2015, Temenos clients invested approximately $1.3 million in Company B.  On April 1, 2015, Taylor emailed the owner of his home and office heating company, "i am about to have money."

d.   On January 20, 2016, a Temenos employee emailed Taylor a list of "priority" outstanding expenses and another list of pending incoming transaction-based compensation payments for investments in Companies A and B.  The employee added, "[w]e NEED to get [a prospective investor's] paperwork signed ASAP. And I know you know this, but we need to get [another Temenos investment adviser representative] working on his folks ASAP as well . . . let's see if we can try and close that deal sooner rather than later."

e.   In April and May 2016, numerous instant message discussions between Temenos employees indicate that Temenos did not have sufficient funds at that time to meet expenses, including payroll, unless Taylor or other advisers could solicit more private placement investments.

64.    Form ADV Part 2A, Item 18.B, requires the disclosure of "any financial condition that is reasonably likely to impair [Temenos'] ability to meet contractual commitments to *clients.*" Temenos's precarious financial condition threatened its ability to continue its business operations, and was material to clients due to the risk of investment loss resulting from the disruption or discontinuance of active investment management.  Yet Defendants concealed this fact from Temenos advisory clients.

## B.   Other Breaches of Fiduciary Duty in Defendants' Advising of Their Advisory Clients

### 1.   Defendants Overbilled Their Clients by Calculating Fees Based on the Original Price of Investments that Had Fallen in Value, Ignoring Temenos's Fair Value Policy for Private Placement Investments

65.    Defendants billed clients' management fees based on inflated asset values that should have been reduced pursuant to Temenos's asset valuation policy.  Equally important, by doing so, they lulled Temenos advisory clients into believing their investments were sound and that Taylor was functioning as a competent investment adviser.  As a result, advisory clients continued to entrust their money to Temenos and Taylor, and continued to invest additional funds in private placements that they recommended

66.    Like many investment advisers, Temenos charged its advisory clients a periodic management fee based on a percentage of the client's "assets under management," that is, the total value of assets managed by the adviser.  For certain advisory clients, Temenos included in its fee calculation (based on assets under management) the purported value of the private placement investments into which Defendants had steered those advisory clients.  Contrary to Temenos's written policies, Temenos improperly valued illiquid private placement investments at the cost of the original investment, and never adjusted the initial prices provided by the issuers

as subsequent events reduced the value of the investments.  In doing so, Defendants significantly overbilled advisory clients for management fees.

67.     Temenos's Policies and Procedures state that Temenos will commonly value a hard-to-price or illiquid security at $0, or in a manner determined "in good faith."  It didn't. Defendants instead valued each of the private placement investments at their purchase price. Defendants failed to adjust the values they attributed to their clients' investments in the private placement investments, even when negative news indicated that the value of those investments had decreased significantly.

68.     For instance, Defendants did not decrease the value of Company B shares on their advisory clients' quarterly advisory statements (and in the calculations of management fees due) even after Defendants learned substantial negative information about Company B's financial condition in July 2015.  In so doing, Defendants misled advisory clients about Company B's financial condition, about the value of advisory clients' assets under management, and about Temenos's performance as an investment adviser.

69.     In a July 2017 letter to the Commission, Temenos conceded that pricing for "private equity" and other non-publicly traded securities was not done pursuant to a fair value policy.

### 2.  Defendants Engaged in Additional Overbilling of Advisory Clients for Management Fees

70.     Temenos's standard investment advisory agreement provided that advisory clients would be charged advisory fees based on assets held at certain identified custodians.  It did not, however, state that advisory fees would be charged on private placement assets which were not held by those custodians.  Temenos nevertheless billed its advisory clients on those assets.

33

71.     Also, in multiple instances Defendants overbilled advisory clients.  For instance, between the third quarter of 2011 and the fourth quarter of 2017, Defendants overbilled one client by approximately $52,000.   Another client was billed on one of her private company investments as if she had made a $200,000 private placement investment, when she had actually made only a $100,000 investment.  That same client was billed on another of her private company investments as if she had made a $150,000 investment when she had only made a $100,000 investment.

72.     In another instance, Defendants were unresponsive to an advisory client's requests to correct Defendants' overbilling, while simultaneously soliciting that client for additional private placement investments.  On February 19, 2014, a Temenos advisory client emailed Taylor reminding him that he had not responded to the client's earlier inquiry regarding whether an advisory fee had been improperly calculated.  Taylor responded, "Ok I will look at it tomorrow and get back to you after school [sic]."  On February 24, 2014, the client followed up, "[n]ot good."  On February 25, 2014, Taylor replied, but did not answer the client's concern and wrote that he was "backed up" because of power outages and computer server updates.  During the same period, however, Taylor solicited the client for an additional private placement investment.  On March 6, 2014, the client wrote that he had been waiting two months for an answer to the overbilling issue and that Taylor had been unresponsive about both the billing and the client's account-related requests.  The following day, Taylor finally admitted that the client's account had been overbilled by more than $1,400.  Instead of refunding that money, Taylor wrote that he would reduce the next quarter's billing, which was another four weeks away.  And, Taylor took that opportunity to solicit the client to make another private placement investment.

A month later, on April 2, 2014, the client followed up, stating via email, "[t]he 1st qtr. Adjustment has not been made to date. . ." Taylor replied the following day that he would manually make the fee adjustment.

### 3. Defendants Engaged in Self-Dealing and Preferential Treatment of Some Advisory Clients

73.     Defendants generally told advisory clients that investments in Company B and the other private placement companies were illiquid, that is, that they could not be sold and that clients would need to wait for a liquidity event (such as a buy-out or a public sale of stock) before they could receive back their investment money and any return on their investment.

74.     For instance, on October 24, 2016, a Temenos advisory client asked Taylor to redeem the client's Company B shares. Taylor responded that he could not get the shares redeemed and that the Company B shares were an illiquid investment.

75.     Notwithstanding these representations, Defendants arranged for two Temenos advisory clients, including a trust that owns 4% of Temenos and for which Taylor served as a trustee, to liquidate their Company B investments early. Defendants arranged for an advisory client, his family, and his family company's pension plan (in September 2016) and for the trust Taylor controlled and which owned a small percentage of Temenos (in December 2015 and March 2016) to liquidate their Company B investments and receive their investment money back. Defendants convinced other advisory clients to buy out the investments of the family and the trust. But Defendants failed to disclose this preferential treatment to any of their other advisory clients, and, in fact, refused other advisory clients' requests to liquidate their private securities holdings. In doing so, Defendants violated their fiduciary duty to their advisory clients.

35

## FIRST CLAIM

**Fraudulent Conduct by an Investment Adviser**
**Violation of Section 206(1) of the Advisers Act**
**(Temenos, Taylor)**

76.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 75 above as if set forth fully herein.

77.     At all relevant times, Temenos and Taylor were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].  Both Temenos and Taylor received compensation in the form of money from clients as compensation for investment advice, and both were in the business of providing investment advice concerning securities, for compensation.  And, Taylor was an "investment adviser" by virtue of his ownership, management, and control of Temenos.

78.     As set forth above, Temenos and Taylor employed devices, schemes, or artifices to defraud clients and prospective clients by:

    a.    recommending their clients invest in unsuitable, high-risk private placement investments;

    b.    failing to perform adequate due diligence on those investments and ignoring red flags about the companies in which they recommended clients invest;

    c.    making material misrepresentations and failing to disclose material information to clients and prospective clients concerning the potential risks, returns, and value of those private placements, the financial condition of the issuers, and Temenos's own failing financial condition;

d.      making material misrepresentations and failing to disclose material information to
clients and prospective clients about Taylor's and Temenos's compensation
arrangements and other connections to the private companies, and the conflicts of
interest those arrangements created in their investment advice;

e.      acting as unregistered broker-dealers, when they were supposed to be acting as
investment advisers;

f.      failing to implement their written policies and procedures regarding the valuation
of the private placement investments and overbilling clients for management fees;
and,

g.      giving preferential treatment to some clients over others, including clients
affiliated with the Defendants, without disclosing that preferential treatment to
clients.

79.      Temenos and Taylor, by use of the mails or any means or instrumentality of
interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly have
employed or are employing devices, schemes, or artifices to defraud a client or prospective
client.

80.      As a result, Temenos and Taylor have violated and, unless enjoined, will continue
to violate Section 206(1) of the Advisers Act [15 U.S.C. §80b-6(1)].

## SECOND CLAIM

**Fraudulent Conduct by an Investment Adviser**
**Violation of Section 206(2) of the Advisers Act**
**(Temenos, Taylor)**

81.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 80 above as if set forth fully herein.

82.     At all relevant times, Temenos and Taylor were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].  Taylor was an "investment adviser" by virtue of his ownership, management and control of Temenos.  Both Temenos and Taylor received compensation in the form of money from clients as compensation for investment advice, and both were in the business of providing investment advice concerning securities, for compensation.

83.     As set forth above, Temenos and Taylor made materially false and misleading statements and omissions to their investment advisory clients and engaged in transactions, practices, or courses of business which operated as a fraud or deceit on clients and/or prospective clients by:

    a.     recommending their clients invest in unsuitable, high-risk private placement investments;

    b.     failing to perform adequate due diligence on those investments and ignoring red flags about the companies in which they recommended clients invest;

    c.     making material misrepresentations and failing to disclose material information to clients and prospective clients concerning the potential risks, returns, and value of

those private placements, the financial condition of the issuers, and Temenos's

own failing financial condition;

d.      making material misrepresentations and failing to disclose material information to

clients and prospective clients about Taylor's and Temenos's compensation

arrangements and other connections to the private companies, and the conflicts of

interest those arrangements created in their investment advice;

e.      acting as unregistered broker-dealers, when they were supposed to be acting as

investment advisers;

f.      failing to implement their own written policies and procedures regarding the

valuation of the private placement investments and overbilling clients for

management fees; and,

g.      giving preferential treatment to some clients over others, including clients

affiliated with the Defendants, without disclosing that preferential treatment to

clients.

84.     Temenos and Taylor, by use of the mails or any means or instrumentality of

interstate commerce, directly or indirectly, acting intentionally, knowingly, recklessly, or

negligently have engaged or are engaging in transactions, practices, or courses of business which

operate as a fraud or deceit upon a client or prospective client.

85.     As a result, Temenos and Taylor have violated and, unless enjoined, will continue

to violate Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

## THIRD CLAIM

### Failure to Implement Written Policies and Procedures
### in Violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 Thereunder

### (Temenos, Taylor as Aider and Abetter)

86.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 85 above as if set forth fully herein.

87.     Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder provide that it shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business for any registered investment adviser, directly or indirectly, to fail to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules adopted thereunder.

88.     Temenos adopted but failed to implement its written policy and procedure concerning the valuation of investments in non-public companies.  Temenos's Policies and Procedures stated that Temenos would value hard-to-price and/or illiquid securities at $0 or in a manner determined "in good faith."  Instead, Temenos and Taylor valued private placement investment securities at purchase value, and did not adjust that value even after receiving information indicating the securities were worth much less.

89.     By failing to implement Temenos's adopted illiquid securities valuation policy, Temenos and Taylor overbilled clients for management fees and misled clients about the status of their private placement investments, the value of their assets under management, and Temenos's performance as an investment adviser.

40

90.     As a result, Temenos violated and, unless enjoined, will violate Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-7 [17 C.F.R. §275.206(4)-7].  Taylor aided and abetted Temenos's violation of those provisions.

### FOURTH CLAIM

**Acting as an Unregistered Broker-Dealer
in Violation of Section 15(a) of the Exchange Act**

**(Temenos and Taylor)**

91.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 0 above as if set forth fully herein.

92.     By engaging in the conduct above, Temenos and Taylor, directly or indirectly, singly or in concert with others, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without being registered as a broker or dealer or associated with a registered broker or dealer in accordance with Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

93.     As part of, and in furtherance of the violative conduct, Temenos and Taylor regularly promoted securities to investors and advised investors about the merits of investing in those securities.  They also directly or indirectly received compensation based on their successful promotion efforts that resulted in purchases or sales of securities.

94.      As a result, Temenos and Taylor, acting directly or indirectly, and singly or in concert with others, violated, and unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter permanent injunctions, including an injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. §80b-6(1), (2), & (4)], Rule 206(4)-7 thereunder [17 C.F.R. §275.206(4)-7], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

B.      Require Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C.      Require Defendants to pay an appropriate civil monetary penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and,

E.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Marc Jones
Marc J. Jones (Mass. Bar No. 645910)
  Senior Trial Counsel
Rua M. Kelly (Mass. Bar No. 643351)
  Senior Trial Counsel
Dawn Edick (Mass. Bar No. 641659)
  Senior Enforcement Counsel
Amy Gwiazda (Mass. Bar No. 663494)
  Assistant Regional Director
Martin F. Healey (Mass. Bar No. 227550)
  Regional Trial Counsel

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8947 (Jones direct)
jonesmarc@sec.gov (Jones email)

DATED: July 18, 2018