## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>v.<br><br>TEMENOS ADVISORY, INC., and<br>GEORGE L. TAYLOR,<br><br>            Defendants. | CASE NO. 3:18-CV-01180 (SRU)<br><br>JURY TRIAL DEMANDED<br><br><br>SEPTEMBER 17, 2018 |

## TEMENOS ADVISORY, INC. AND GEORGE L. TAYLOR
## JOINT ANSWER AND AFFIRMATIVE DEFENSES

Defendants Temenos Advisory, Inc. ("Temenos") and George L. Taylor ("Taylor")

(collectively "Defendants"), through their undersigned attorneys, hereby Answer the numbered

paragraphs of the July 18, 2018 Complaint (Dkt. No. 1) as follows:

1. Temenos is a Connecticut-based investment adviser and Taylor is the majority owner of
   Temenos and also holds several positions at the firm, including chief executive officer
   ("CEO"). From 2014 through 2017, Temenos and Taylor defrauded their advisory clients
   and prospective clients by steering the clients into unsuitable investments and by hiding
   commissions and other financial incentives that Temenos and Taylor were pocketing, on
   top of the advisory fees that the clients were paying for supposedly unbiased financial
   advice. Temenos and Taylor repeatedly downplayed or concealed risks, and overstated
   potential gains, associated with a series of illiquid private placements that they advised
   their clients and prospective clients to invest in.  In so doing, Defendants promoted the
   investments and pocketed commissions (a percentage of each client's investment) from
   the private placement companies, thereby illegally acting as unregistered broker-dealers.

**ANSWER:  Defendants admit Temenos is a Connecticut-based investment adviser and admit Taylor is the owner and CEO.  Defendants deny Temenos and Taylor defrauded their advisory clients and prospective clients by steering the clients into unsuitable investments and by hiding commissions and other financial incentives.  Defendants deny the remaining allegations in paragraph 1.**

2.  Through their conduct, Temenos and Taylor violated the fiduciary duty that every investment adviser owes to its clients and prospective clients: to put client interest's first, to deal with clients with the utmost honesty, to disclose all conflicts or potential conflicts of interest, and to use reasonable care in providing investment advice.  Instead, Defendants ignored their clients' interests and biased their investment advice to put money in their own pockets. The advisory clients and other investors harmed by the Defendants included retail investors, and some of the harmed investors were senior citizens or individuals approaching retirement who invested money from their retirement funds or pension plans into the private investments recommended by the Defendants.

**ANSWER: Defendants deny the allegations in paragraph 2.**

3.  In connection with steering clients into four private placement investments, Temenos and Taylor breached their fiduciary duty to advisory clients and prospective clients by:

   a)  failing to perform due diligence commensurate with even minimal fiduciary obligations (such as reviewing full financial information and investigating the truth of claims made by the issuers);
   b)  failing to disclose known defects that came to their attention, such as: a company's poor financial condition, questionable spending practices, potential liabilities, misstatements and omissions in the companies' marketing materials, and dubious claims by one company about its technology;
   c)  aggressively pushing advisory clients to invest in securities in which Temenos and Taylor had undisclosed conflicts;
   d)  recommending investments that they knew, or were reckless in not knowing, were not suitable or appropriate for particular investors;
   e)  grossly understating significant risks of investing in private placements generally;
   f)  intentionally making numerous materially false and misleading statements and materially incomplete disclosures concerning the potential risks, returns, and value of particular private placements;
   g)  failing to disclose Temenos' own failing financial condition;

h) giving preferential treatment to a partial owner of Temenos (the trust for which Taylor served as trustee), by permitting it to redeem its principal investment in an illiquid investment (a privilege denied to other clients); and

i) overcharging clients advisory fees by overvaluing the private placement investments, in violation of Temenos' own written policies.

**ANSWER: Defendants deny the allegations in paragraph 3.**

4. Temenos and Taylor also played an extensive role in soliciting the private placement investments in exchange for commissions from the private companies. In doing so, they illegally acted as unregistered broker-dealers when selling those investments.

**ANSWER:  Defendants deny the allegations in paragraph 4, except that Defendants admit that Temenos was not a broker-dealer, but at all times relevant to the Complaint, Taylor was properly licensed to sell securities as a registered representative associated with a broker-dealer, while duly licensed as an investment adviser representative qualifying him to manage investments through Temenos.**

5. Through the activities alleged in this Complaint, Temenos and Taylor, while acting as investment advisers, have employed devices, schemes and artifices to defraud their investment advisory clients and have engaged in acts, transactions, practices and courses of businesses which operated as a fraud on their investment advisory clients, in violation of Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"). Temenos violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder by failing to implement its written valuation policy. Taylor aided and abetted that violation. And, Temenos and Taylor violated Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") by inducing and-attempting to induce the purchase and sale of securities without being registered as a broker or dealer or being associated with a registered broker or dealer.

**ANSWER:  Defendants deny the allegations in paragraph 5.**

6. The Commission seeks:

a) entry of appropriate permanent injunctions, including an injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws;

b) disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest; and,

c) imposition of civil penalties due to the egregious nature of Defendants' violations.

**ANSWER:  Paragraph 6 is a statement of proposed relief and therefore no response is required.  To the extent a response is required, the Defendants lack sufficient information to form a belief as to the truth of the allegations, and so the allegations are denied.**

7. The Commission seeks a permanent injunction and disgorgement pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] and Section 2l(d)(l) of the Exchange Act [15 U.S.C. § 78u(d)(l)]. The Commission seeks the imposition of a civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] and Section 2l(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**ANSWER:  The Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 7, and so the allegations are denied.**

8. The Court has jurisdiction over this action pursuant to Sections 2l(d), 2l(e)  and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa] and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), SOb-14].

**ANSWER: Defendants admit the jurisdiction as alleged in paragraph 8.**

9. Venue is proper in this District because, at all relevant times, Temenos and Taylor operated as investment advisers and served advisory clients in Connecticut.  In addition, the acts, transactions, practices, and courses of business constituting the alleged violations occurred in Connecticut.

**ANSWER:  Defendants admit venue, but deny the remaining allegations in paragraph 9.**

10. In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

**ANSWER: Defendants deny the allegations in paragraph 10.**

11. Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

**ANSWER: Defendants deny the allegations in paragraph 11.**

12. Temenos Advisory, Inc. is a Connecticut corporation founded by Taylor with its principal place of business in Litchfield, Connecticut and additional offices in St. Simons Island, Georgia, and Scottsdale, Arizona.  Temenos has been registered with the Commission as an investment adviser since 1999, and is owned by George Taylor and a trust that was set up for the benefit of Taylor's former business partner.

**ANSWER:  Defendants deny the allegations in paragraph 12.**

13. George L. Taylor, age 62, is a resident of Litchfield, Connecticut.  Taylor is the CEO, founder, Chief Compliance Officer, and majority owner of Temenos. Taylor is also a registered representative of a broker-dealer that is not affiliated with Temenos.  Taylor is registered as a General Securities Representative, a General Securities Principal, an Investment Company Products variable Contracts Principal, and a Uniform Securities Agent with the Financial Industry Regulatory Agency.

**ANSWER:  Taylor admits his residency and age, and admits he is the CEO, founder, Chief Compliance Officer and majority owner of Temenos.  Taylor admits he is fully registered with a broker-dealer and was so registered during the time period in question as alleged.**

14. Before 2014, Temenos and Taylor had invested their advisory clients' money primarily in mutual funds, exchange traded funds, variable annuities, and publicly traded stocks. They charged an asset management fee to their clients based on the clients' total assets under their management.

**ANSWER: Defendants admit the allegations in paragraph 14.**

15. Starting in 2014, Temenos and Taylor began actively recommending the privately offered securities of four private companies to Temenos' clients and prospective clients. Between 2014 and 2017, Defendants placed more than $19 million in investments by their clients and others in these four private issuers' securities.  And they did so without ever sufficiently examining the marketing claims, financial statements, or the business activities of those companies.

**ANSWER:  Defendants admit that defendant Taylor recommended to some clients that they acquire private equity issued by certain companies whose securities were not registered with the Securities and Exchange Commission during the time period 2014-2017, but Defendants deny the remaining allegations in paragraph 15.**

16. Critically, by steering their clients' investments into those securities of the four private companies, Temenos and Taylor arranged to covertly collect commissions  (a percentage of the amount invested) on top of the asset management fees their clients are already paying for unbiased advice. Although their due diligence was inadequate, their financial incentives to recommend these private securities offerings were not.

**ANSWER:  Defendants deny the allegations in paragraph 16.**

17. Defendants recommended their clients invest in the securities offerings of at least four private companies.

**ANSWER:  Defendants admit they recommended securities offerings of at least four**

**private companies to certain of their clients, but deny the remaining allegations in**

**paragraph 17.**

18. Company A marketed an emergency response communications product. Beginning on or about April 25, 2013, Company A engaged in a private placement securities offering.

**ANSWER:  Defendants lack sufficient information to form a belief as to the accuracy or**

**truthfulness of the allegations in paragraph 18, as the identity of Company A is not alleged,**

**and so the allegations are denied.**

19. Temenos and Taylor solicited investments in Company A.  Between February 2014 and February 2017, Temenos solicited approximately $11.2 million of investments in Company A from their advisory clients and other individuals (certain of whom later became advisory clients of Temenos).  From September 2014 through February 2017, pursuant to a "Finder's Engagement" agreement with Company A, Temenos solicited investments in Company A as its "finder." From October 2014 through February 2017, Company A compensated Temenos for Temenos' role in the private placement. Temenos, at Taylor's direction and under his signature as CEO, entered into a "Finder's Engagement" with Company A, effective September 1, 2014.  Under that agreement, Temenos received money equal to 2.5% of each investment it brought to Company A. On September 9, 2015, Temenos and Company A extended that agreement and changed the compensation that Temenos received.   Under the extended agreement, Temenos received 5% of each investment it brought to Company A.

**ANSWER:  Defendants lack sufficient information to form a belief as to the accuracy or truthfulness of the allegations in paragraph 19, as the identity of Company A is not alleged, and so the allegations are denied.**

20. Company B purported to be building a fiber optic connection between locations along the east coast of the United States.  Beginning on or about January 15, 2015, Company B engaged in a private placement securities offering.

**ANSWER: Defendants lack sufficient information to form a belief as to the accuracy or truthfulness of the allegations in paragraph 20, as the identity of Company B is not alleged, and so the allegations are denied.**

21. Temenos and Taylor solicited investments in Company B.  Between September 2014 and March 2017, Temenos solicited approximately $7 million of client investments in Company B.  From January 2015 to August 2015, Temenos solicited investments in Company B through a solicitation arrangement with an intermediary. Temenos, at Taylor's direction and under his signature, entered into a "Non-Exclusive Placement Agency Agreement" with Company B effective August 1, 2015.  Under that agreement, Temenos received a fee equal to 5% in cash and 5% in equity (that is, an ownership stake in Company B) of each investment brought to company B.  From September 2015 through February 2017, Company B compensated Temenos directly for Temenos' role in the solicitations.

**ANSWER: Defendants lack sufficient information to form a belief as to the accuracy or truthfulness of the allegations in paragraph 21 as the identity of Company B is not alleged, and so the allegations are denied.**

22. Company C marketed itself during the relevant time period as a crowd funding investment portal.  Company C's founder and president is a former registered representative of a broker-dealer.   Prior to founding Company C, he owned a company that had a solicitation agreement with Company B.  Company C employs Taylor's wife as Managing Director, Customer Experience. Prior to that, she served as Principal Director of Investor Strategies.  She received stock options in Company C as part of the compensation.  For a short time, Defendant Taylor served on Company C's investment committee.  Beginning on or about March 18, 2016, Company C engaged in a private placement securities offering.

7

**ANSWER: Defendants lack sufficient information to form a belief as to the accuracy or**

**truthfulness of the allegations in paragraph 22, as the identity of Company B is not alleged,**

**and so the allegations are denied.**

23. Temenos and Taylor solicited investments in Company C.  Between March 2016 and
January 2017, Defendants solicited $805,000 of client investment in Company C.

**ANSWER: Defendants lack sufficient information to form a belief as to the accuracy or**

**truthfulness of the allegations in paragraph 23, as the identity of Company C is not alleged,**

**and so the allegations are denied.**

24. In the meantime, shortly after Temenos and Taylor began soliciting investments in
Company C from their clients, Temenos and Taylor began to receive undisclosed
payments from Company C.  On July 6, 2016, Company C's CEO confirmed that
Temenos would receive a fee equal to 7% of each investment it brought to Company C in
cash, and 5% more in Company C equity.  On July 15, 2016, Company C offered Taylor
an additional financial incentive to solicit investments, promising Taylor an additional
25, 000 options on purchasing Company C stock once Defendants had successfully
solicited $500,000 of investments for Company C. The email between the CEO and
Taylor acknowledges that Temenos would have Temenos' advisory clients invested in
Company C, and that Taylor would also be marketing Company C to non-clients as well
to people "beyond [Taylor's] own contacts."  From August 2016 through December 2016,
Company C compensated Temenos for Temenos' solicitations.  In December 2016,
Temenos, at Taylor's direction and under his signature, entered into a "Finders (sic)
Agreement" with Company C, retroactively effective as of February 10, 2016. Under that
agreement, Temenos received money equal to 7% of each investment it brought to
Company C.

**ANSWER: Defendants lack sufficient information to form a belief as to the accuracy or**

**truthfulness of the allegations in paragraph 24, as the identity of Company C is not alleged,**

**and so the allegations are denied.**

25. Company D purported to have developed a new water purification technology.  In or
around early August 2015, approximately one month after two of the three Temenos
advisory clients who invested in Company D had completed their investments, the
owners of Company D's parent company fired Company D's president, and withdrew all
the money from Company D's checking account.

**ANSWER: Defendants lack sufficient information to form a belief as to the accuracy or**

**truthfulness of the allegations in paragraph 25, as the identity of Company D is not alleged,**

**and so the allegations are denied.**

26. Temenos and Taylor solicited $225,000 of client investments in Company D. From in or about December 2014 to in or about July 2015, Temenos, through Taylor, solicited investments in Company D.  Taylor expected that Company D would pay Temenos a 5% finder's fee for investments in Company D from Temenos clients.

**ANSWER: Defendants lack sufficient information to form a belief as to the accuracy or**

**truthfulness of the allegations in paragraph 26, as the identity of Company D is not alleged,**

**and so the allegations are denied.**

27. Throughout the relevant period, Taylor made statements to clients that misleadingly suggested that the private placement investments Temenos offered had been carefully vetted and selected from a large group of potential offerings based on their favorable risk/return potential, and were suitable for any wealthy investor.  They weren't. Defendants did not perform adequate due diligence before recommending that advisory clients invest in the private placement companies.   Instead, they recommended those investments without even the most basic information on the companies necessary to judge the risks and rewards of those investments and with a reckless disregard for the truth of their statements about those investments.

**ANSWER: Defendants deny the allegations in paragraph 27, except the allegation that**

**Taylor told clients and others private equity he recommended had been carefully vetted**

**and selected from a large group of potential offerings based on their favorable risk/return**

**potential.**

28**.** Defendants repeatedly represented that they had performed due diligence on the private placement investments and that the investments were suitable for their clients. For instance:

a) In emails set to clients and other prospective investors in December 2014 and May 2015, and December 2015 Taylor wrote, "We are fortunate to see many opportunities in the private equity space.  We try to select those which are lower risk (all private equity is risky), those which exhibit exceptional return potential and those which are helping to make our country a better place."

b)  On May 7, 2015, Defendants emailed numerous advisory clients and others soliciting them for an investment in Company B informing client's .that Temenos sees many opportunities to invest in private companies and tries to select those which are lower risk, exhibit exceptional return potential, and help make the country a better place.

c)  In a December 2016 email to advisory clients and others, Taylor stressed that all of Temenos' private issuer securities offerings "have strong management teams and compelling business models."

d)  In a February 2017 email to advisory clients and others, Taylor stated, "we don't recommend every investment that we have access too [sic]... we have a process of due diligence and vetting." In making these claims about the selection of investment opportunities, Defendants failed to notify investors that, in fact, they had not independently assessed the risk or return potential of these companies. Moreover, Defendants omitted to mention a key selection criterion for the private companies in question:  the willingness of those companies to pay Taylor for every client dollar steered to those companies.

**ANSWER:  Defendants admit the authenticity of the alleged emails and state that the**

**emails state what they state, but Defendants deny the remaining allegations in paragraph**

**28.**

29. Defendants recommended advisory clients and prospective clients invest in these private companies without doing sufficient due diligence to determine the risk of those investments, the financial stability of those companies, the business prospects of the companies, or the suitability of the investments for particular clients.  They forwarded emails from these companies to their advisory clients and prospective clients without performing even minimal due diligence, without adequate effort to determine the accuracy of the representations they were sending to advisory clients, and with reckless disregard for the truth of those representations.

For instance:

a)  Defendants did not review financial statements for Company B prior to touting Company B to clients and prospective clients.  Defendants began placing client funds into Company B in January 2015, well before they ever saw Company B's financial information.  When, much later, in July 2015, Defendants saw full financial information about Company B, they discovered that Company B did not have enough money to build the fiber optic line it claimed to be building, and was using most of its money for marketing instead.

b)  Defendants failed to discover and/or disclose that, between March 2015 and March 2016, several lawsuits were filed against Company B and that Company B lost

control of a key land parcel, which significantly jeopardized Company B's ability to build its fiber optic line;

c) Defendants did not conduct due diligence on Company C before recommending their clients invest. Instead Defendants relied only on their uninformed, subjective opinion that Company C had good legal counsel and a good compliance firm.

d) Defendants' due diligence on Company D was limited to reading the company's business plan and sending that information to a couple of Defendants' clients who were engineers. One of those engineer clients bluntly notified Defendants that Company D's technology was "a bunch of crap." Taylor also declined an invitation from Company D for Taylor to visit the Company D facility and view its technology.

e) On June 28, 2015, Taylor emailed a prospective investor, unreservedly recommending an investment in Company D and asking for more investment money based on his great results. Without having conducted due diligence on the company, Taylor wrote that, "... by July they will be increasing the value of the company from 10 million valuation] to $100 million]" and represented that the company would sell every unit they make and become a dominant "industry disruptor" that would be an "$8 billion business." Taylor also stated that the odds were over 60% that technology will work as claimed" and if"[i]t succeeds you will get at least 10 to 25 times your investment...." He had no basis for either the supposed calculation of the odds the technology would work or for the expected return on investment if it did.

**ANSWER: Defendants admit the authenticity of the alleged emails and state that the emails state what they state, but Defendants deny the remaining allegations in paragraph 29.**

30. Defendants also disregarded negative information contained in the financial statements of some of the private companies, and failed to disclose this negative information to advisory clients or prospective clients when they solicited them to invest. For instance, Defendants knew that Company B had been rapidly using up its available cash and may be facing insolvency, but nevertheless recommended their clients invest in Company B and collected its resulting commissions.

**ANSWER: Defendants deny the allegations in paragraph 30.**

31. Defendants failed to corroborate the claims they later made to advisory clients and others about the private placement companies. Defendants did not obtain sufficient information to determine the merits and suitability of the private companies as investments they recommended to their advisory clients and prospective clients. Nor did they corroborate the information they received from the private placement companies in connection with their provision of investment advice. Instead, in many cases, Defendants blindly

forwarded and/or parroted information received from the private placement companies. Defendants failed to exercise reasonable care, failed to conduct sufficient due diligence, failed to make an investigation that would provide them with a reasonable basis to believe their representations about the private placement companies were true and accurate, and failed to obtain the information necessary to determine whether the investments were suitable for their current and prospective advisory clients.

**ANSWER:  Defendants deny the allegations in paragraph 31.**

32. Though they were actively engaged in, and compensated for, soliciting investments in the private placement companies, prior to March 31, 2015, Temenos did not disclose to its advisory clients that it received compensation from the private placement companies. Registered investment advisers are required to file with the Commission a document called the Form ADV, which is a uniform form used to register with the Commission or, in some instances, a state securities regulator.  Form ADV contains a variety of disclosures about the adviser and its advisory business that must be updated at least annually.  Temenos' Form ADV Part II, dated March 26, 2014, makes no mention of private placement or private equity investments.   Beginning in March 2015, Temenos included a generic disclosure in its Form ADV about the possibility that it might receive "finder's fees" for private equity investments. Temenos' Form ADV Part II, dated March 31, 2015, states, "[w]e have and may receive finder's or consulting fees for recommending certain private placements or private equity deals. Typically these are only done with accredited investors whom we decide these types of investments are suitable for."  In its Forms ADV Part II, dated January 15, 2016 and March 31, 2017, Temenos provided slightly more disclosure, stating that: "We may get paid a finder's fee or consulting fee for offering these type of (private] investments to our clients..... Our compensation will vary, but typically has ranged from zero to 10%.  This could include cash or stock compensation." Temenos' Form ADV Part II general disclosure about the possibility of receiving compensation was, at best, a half-truth, failing to alert clients that Temenos and Taylor were pocketing commissions when they put clients into particular private offerings, even while the clients were paying advisory fees. Such general disclosures were insufficient to enable clients to make an informed decision on whether to invest in a particular security, or to retain Temenos as an adviser.  While after March 31, 2015, Temenos had generally disclosed that it "may" receive a finder or consulting fee, it failed to tell clients and prospective clients that it, in fact, was routinely receiving fees for investments in the private placement offerings and that the fees were many times larger than the advisory fees the clients were paying for advice. Nor did Temenos notify clients when Temenos and/or Taylor were being compensated by receiving ownership interests in the companies, and what effect that conflict of interest had on Temenos' investment advice.

**ANSWER:   Temenos admits it received finder fees from some but not all companies in**

**which its clients purchased private equity.  Defendants deny the remaining allegations in**

**paragraph 32.**

    33. In particular, Defendants repeatedly failed altogether to tell clients that Defendants were
getting paid by the private companies at the times when Defendants were soliciting and
investing clients' funds in those companies' offerings.  For instance, on March 6 and 19,
2015; May 7 and 23, 2015; June 23, 2016; August 2, 2016; November 25, 2016; and
December 27, 2016, Defendants sent emails to numerous advisory clients and other
prospective investors soliciting investments in Company B.  These emails did not
disclose that Temenos expected to receive as compensation from Company B a
percentage of the amount invested, nor was this information disclosed to those who
expressed interest in the investments.

**ANSWER:  Defendants admit the authenticity of the emails described in the allegations in**

**paragraph 33, but Defendants deny the characterizations and legal conclusions in the**

**remaining allegations of paragraph 33.**

    34. The disclosures Defendants did make were incomplete and misleading.  For example, on
December 10, 2014, Defendants disclosed to approximately 35 advisory clients that
Temenos would receive as compensation 3% of the amount invested in Company B.
Numerous additional prospective investors received only later emails, which did not
contain any such disclosure.  By August 1, 2015, Temenos' compensation from Company
B had increased to 5% of the amount invested, but Defendants did not disclose the
increase, even to those who had been told about the 3% fee.  Nor did Defendants later
disclose this information to clients who they recommended invest in Company B.

**ANSWER:  Defendants admit advisory clients were always told what, if any, compensation**

**Temenos and/or Taylor would receive for successfully introducing investors to private**

**equity offerings, but Defendants deny the remaining allegations in paragraph 34.  In**

**further answering, Defendants deny the accuracy of the Plaintiff's characterizations and**

**legal conclusions in paragraph 34.**

35. On August 15, 2015, Defendants emailed numerous advisory clients and others soliciting investments in Company A.  This email did not disclose that Temenos expected to receive a percentage of the amount invested in Company A from Company A as Compensation. On September 23, 2015; November 19, 2015; December 4, 2015; January 13, 2016; April22, 2016; May 16, 2016; June 20, 2016; August 17, 25, and 31, 2016; September 30, 2016; October 17, 2016; November 25, 2016; December 27, 2016; and January 10, 2017, Defendants sent additional emails to numerous Temenos advisory clients soliciting investments in Company A.  None of these emails .disclosed that Temenos expected to receive as compensation a percentage of the amount invested.  Nor did Defendants later disclose this information to clients who they recommended invest in Company A.

**ANSWER:  Defendants admit the authenticity of the emails referenced in paragraph 35, but Defendants deny the remaining allegations, characterizations of legal duties implied by the allegations.**

36. On August 2, 2016; September 19, 2016; October 18, 2016; December 27, 2016; January 23, 2017; and January 26, 2017, Defendants emailed numerous advisory clients and others soliciting investments in Company C.  Several of these emails attached Company C marketing materials.  Defendants did not disclose that Temenos expected to receive as compensation from Company C a percentage of the amount invested in Company C.  Nor did Defendants later disclose this information to clients who were considering investing in Company C.

**ANSWER:  Defendants admit the authenticity of email described in paragraph 36, but deny the remaining allegations and deny the accuracy of Plaintiff's characterization of these emails.  In further answering, Defendants deny the accuracy of the Plaintiff's suggestion that Defendants had a legal duty to disclose compensation terms in every email to clients about private equity offerings that they could introduce to clients and others.**

37. Defendants failed to disclose several other actual or potential conflicts of interest to clients and potential clients when recommending investments in the private offerings. For instance:

a) Defendants did not disclose to clients that both Temenos and Taylor, personally, were under financial stress and were struggling to meet operating expenses when they recommended that clients invest in securities from which they received, as compensation, a commission based upon the amount invested.

b) Defendants did not disclose their expected ownership interests in Company B or Taylor's expected ownership interests (or, for certain clients solicited at the end of 2016, Taylor's wife's ownership interests in the form of equity options) in Company C when advising their clients about Company B, Company C, or Company C-related investments, when soliciting their clients for investment in Company C, or when recommending their clients invest in securities offered through Company C's crowd-funding platform.

c) Defendants did not disclose that Taylor had become actively involved in helping the management of Company B as a member of Company B's Finance Committee, and, for a time, was part of an "advisory committee" for Company C.

**ANSWER:   Defendants deny the allegations in paragraph 37.**

38. By failing to disclose this information to advisory clients and prospective clients who were solicited to invest in these companies, while holding themselves out as investment advisers, Defendants intentionally made fraudulent misrepresentations and material omissions to those clients and prospective clients.

**ANSWER:   Defendants deny the allegations in paragraph 38.**

39. Defendants recommended the private placement company investments to all of their investor clients who they believed to have sufficient income, regardless of whether those risky investments were right for a particular client.  They emailed numerous advisory clients, recommending that clients invest in the private companies' securities; without concern for the clients' personal circumstances or risk tolerance.  For example:

a) In June 2016, Taylor told over 100 clients by email that, "[m]utual funds and separate accounts are expensive and inefficient." and "[w]ith our accredited investors, private equity is a key component to increase potential return and to decrease overall risk."

b) On February 13, 2017, Defendants sent a mass email to Temenos clients stating, "[w]e believe that wealthy investors should have some private equity investment. ..." and, "[i]ncluding more and different types of private equity companies increases the odds that one will be successful in this asset class, as in all others."  Defendants should not have been soliciting from their entire client base to invest in the private companies' securities investments which were inherently high risk and illiquid with a long-term and indefinite time horizon.

**ANSWER:  Defendants deny the allegations in paragraph 39.**

40. Defendants continually recommended these private placement investments to specific advisory clients and prospective clients regardless of the suitability of the investments for that client.  For several clients whom Defendants convinced to invest in those private placement offerings, those investments were wholly unsuitable when considering the clients' inability to tolerate the risk of losing money on the private placement investments and when considering the time by which the clients would need to liquidate their investments to use the invested funds.  For instance, Defendants placed two-thirds of one particular client's retirement funds into private placement investments.  This client, a 52-year-old woman with a risk averse investment approach, had transferred to Temenos all of her retirement funds (approximately $350,000), which had previously been invested in a diverse portfolio of mutual funds and publicly traded common stock.  Defendants advised her to sell most of those investments in order to invest in three of the private placement investments.  Taylor told the client that the Investments would earn her a higher rate of return for the fifteen years she planned to continue working.  The client knew the companies she had invested in were not yet publicly traded, but did not understand the risks associated with investing in private placements.  Defendants did not explain to her that these private placements were higher risk investments than those she had. Defendants also did not tell the client that Taylor's wife worked for one of the recommended companies, or that Defendants would receive commissions from the private placement companies for her private placement investments.  Taylor also falsely told the client that the Company A private placement was a two-year commitment when he actually had no way of knowing whether the investor would have an exit opportunity at the end of two years.

**ANSWER:  Defendants deny the allegations in paragraph 40.**

41. In another example, Taylor convinced an elderly widow to invest at least $350,000 of her retirement funds in the four private placement companies, within three months of her husband's death.  The woman's husband had previously handled all of the couple's finances and, with the exception of a $100,000 investment in Company A, the couple's assets had been invested entirely in mutual funds, variable annuities, and common stock of publicly- traded companies prior to the husband's death.  In less than two years after her husband's death, Taylor convinced this widow to invest 34% of her total assets managed by Temenos in risky private placement investments.

**ANSWER:  Defendants deny the allegations in paragraph 41.**

42. At other times, Defendants greatly understated the risks of investing in these private placement investments.  On March 20,2015, Taylor wrote to a prospective investor, "I know that you are not swimming in current cash flow but [the Company B] investment that (sic) we can do is god (sic) as it gets..."  Taylor stated that the estimated return over five years was 20 times the invested amount, and suggested the client use more of their IRA retirement savings to make the investment.

**ANSWER:  Defendants deny the allegations in paragraph 42.  In further answering, Defendants deny the characterization and implication of a legal duty as alleged in paragraph 42.**

43. Defendants determined that, based on the questionable technology involved, Company D was a high-risk investment, and invested funds from three clients in Company D's offering.  Taylor treated these three investors as investors with what he termed "off-the-charts" risk tolerance who would "do anything" in terms of investments.  In so doing he ignored that one of these investors had specifically told Taylor she was a conservative investor, and another had been recently widowed and was reliant on her investments for living expenses.

**ANSWER: Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 43 as Plaintiff fails to identify the names of the "clients" and fails to identify the company at issue, and so the allegations are denied.**

44. Taylor and Temenos solicited their advisory clients and others to invest in certain private securities offerings.  In each case, Temenos and Taylor either directly or indirectly received compensation from these issuers based on their sales activities equating to a percentage of each sale.  And, in several instances, Defendants also received, directly or indirectly, stock compensation (that is, an ownership interest in the companies they promoted) for their sales efforts.

**ANSWER:  Taylor admits he solicited advisory clients and others to invest in certain private securities offerings, and that compensation was received from some but not all issuers.  In further answering, Defendants admit Temenos received stock compensation from one issuer, but Defendants deny the remaining allegations in paragraph 44.**

45. In these solicitations of investments in the private placement companies, Temenos and Taylor each illegally acted as a broker.  That is, their activity went well beyond bringing two parties together and passively awaiting the possible consummation of a transaction. Instead, Defendants received commissions on the investments they brought in; actively promoted the securities of the private placement companies; and actively, rather than passively, found and solicited investors.

**ANSWER: Defendants deny the allegations in paragraph 45.**

46. Defendants, acting as unregistered brokers, used marketing emails to actively recruit potential investors to invest in the private placement securities Taylor promoted, including in emails to numerous advisory clients and others on May 7, 2015 (soliciting for Company B) and on August 2, 2016 (attaching marketing materials including an executive summary and marketing slides produced by Company C).  While Defendants' advisory clients were paying for prudent investment advice tailored to their individual needs, Defendants' emails employed classic "hard sell" tactics, creating a sense of urgency by indicating that offerings were close to fully funded, and/or that prices were about to increase, and/or that the time for buying at a specified price was limited.  In other words, Defendants' advisory clients were paying for someone to guide them and put their interests first; what they got was a salesman putting his own interests first without disclosing his pecuniary interest in doing so.

**ANSWER:  Defendants deny the allegations in paragraph 46.**

47. Defendants also promoted and facilitated the private placement investments by providing potential investors with subscription agreements, business plans, and securities offering memoranda.  For example, on August 8 and 9, 2016, Defendants sent Company C's subscription agreements to prospective investors for signature.

**ANSWER:  Defendants deny the allegations in paragraph 47.**

48. Defendants also touted the merits of investing in these securities, telling their clients (without basis) about the potential for returns and the likely timetable for achieving those returns. For example:

   a) On November, 19, 2015, Defendants emailed numerous advisory clients and others touting investments in Company A, describing the company's product as "simply the best and only solution," telling investors they would not be locking up their money for a long period of time and describing its risk/return ratio as an investment as "great."

   b) On June 20 and August 16, 2016, Defendants emailed dozens of prospective investors soliciting investments and opining that Company A continued to be one of the lowest risk, highest return investments available.

    c) In an August 4, 2016 email to a prospective investor in Company A, Taylor detailed why he believed Company A to be a "uniquely promising investment" adding that rarely in his career had he been as excited about an offering.  Taylor stated that it was the opinion of Temenos that Company A's business would be worth $3 to $5 billion over the following couple of years. Taylor also opined that Company A would be sold for $1 to $3 billion dollars, and if that happened investors would make 10 to 30 times their investment.  Taylor made these same representations to investors by emails dated August 16, 25, 27 and 29.

    d) In a January 24, 2017 email to an advisory client who asked about the potential return on Company C, Taylor responded, "5 year hold.  10x"

**ANSWER:  Defendants admit the authenticity of the emails identified in paragraph 48, and admit that the emails state what they state.  In further answering, Defendants deny the remaining allegations and characterizations implicit in those allegations in paragraph 48.**

49. Temenos assisted in effectuating the transactions by collecting signed documents and checks from investors and forwarding them to the issuers and by issuing wiring instructions to transfer clients' funds to issuers.  For example:

    a) On April, 2015, Temenos sent a subscription document for an investment in Company B to a Temenos advisory client for signature, and provided wiring instructions.

    b) In June 2015, in connection with a Temenos advisory client's investment in Company D, Defendants collected from their client a personal check made payable to Company D, and forwarded it to Company D.

    c) On April 29, 2016, in connection with a Temenos advisory client's investment in Company A, Temenos sent the client's signed wire transfer request to the firm that maintained the client's brokerage account, instructing that $50,000 be wired from the client's  brokerage account to Company A's bank account.

    d) On August 16, 2016, in connection with a Temenos client's investments in Company C, Temenos sent a wire request to the custodian of the client's account, requesting the transfer of funds to Company C's bank account.

    e) On August 8, 2016, a Temenos employee even offered to pick up the executed subscription agreement and a check made out to Company C.  The Temenos employee made the same offer to another Company C investor on August 9, 2016.

**ANSWER:  Defendants lack sufficient information to form a belief as to the truth and/or accuracy of the allegations in paragraph 49 and its various subparts because of the failure to identify the companies to which the allegations refer, and so all the allegations are denied.**

50. Temenos and Taylor received transaction-based compensation for their services to Companies A, B, and C, each of which paid Temenos fees based on a percentage of the capital commitments made by the investors Taylor brought to them.

**ANSWER:   Defendants deny the allegations in paragraph 50.   In further answering, Defendants admit that certain issuers paid finder's fees but no fees were ever paid based upon capital commitments.**

51. In soliciting investments in the private placement companies, Defendants acted as unregistered broker-dealers.  During the time period when Defendants were soliciting investments in the private placement companies, Defendants were not registered with the Commission as broker-dealers.  Nor were they associated with a broker-dealer that was overseeing their solicitation efforts, or otherwise qualified for an exemption or safe harbor provision concerning their activities as broker-dealers.

**ANSWER:  Defendants deny the allegations in paragraph 51.  In further answering, Defendants state that at all relevant times, Mr. Taylor was properly licensed to sell securities with a broker-dealer and that as the chief compliance officer for the branch of the broker-dealer he was responsible for supervising his own sales activities.**

52. Defendants made several misrepresentations and fraudulent omissions about the private placement companies to advisory clients and prospective clients.  For instance:

a) On August 2, 2016, Taylor emailed approximately 50 current and prospective advisory clients touting Company B's "long term contracts" with Verizon, Amazon and AT&T. These contracts did not exist.

b) On October 18, 2016, Taylor emailed over 250 current and prospective advisory clients notifying them of Company C's impending website launch.  That same day, a Temenos client replied to Taylor's email, asking, "And what is your commission on that one?"  Taylor responded, "i don't get commissions" [sic], despite the ongoing arrangement that Temenos had with Company's C's CEO to receive a fee equal to 7% of each investment it brought to Company C in cash, and 5% more in Company C equity.

c) In a November 19, 2015 email to over 140 recipients, including current advisory clients, Taylor falsely represented that the last three Boston Marathons had used Company A's product, suggesting that the product had been used at the time bombs were placed on the marathon route in 2013.  Taylor also repeated Company A's assertions about a partnership with a particular technology company, and also represented that Company A's technology was being used by several other specified technology companies, without any attempt to verify these claims before repeating them to his clients.

**ANSWER:   Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 52 as they do not identify company or investor names, and so the allegations are denied.**

53. In July 2015, Defendants learned that Company B had large off-balance sheet liabilities, as well as significant debts and expenses. Also, during this time Taylor served on Company B's Finance Committee, as an uncompensated adviser to Company B. Defendants intentionally failed to disclose either their conflicts or Company B's financial difficulties to advisory clients who had already invested in Company B or to clients and prospective clients that they solicited to invest in Company B.

**ANSWER:   Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 53 as they do not identify company or investor names, and so the allegations are denied.**

54. Later, on or about August 1, 2015, Temenos entered into a solicitation agreement giving Temenos both money and Company B equity in exchange for investments.  Specifically, Temenos expected to receive a fee equal to 5% of each investment in cash, plus 5% of each investment in shares of Company B.  Taylor did not disclose that arrangement to his advisory clients who were current or prospective investors in Company B.

**ANSWER:  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 54 as they do not identify company or investor names, and so the allegations are denied.**

55. Soon after, Defendants successfully assisted in soliciting a new investor for Company B. At that time, Taylor had seen the complete Company B financial statements, and knew the full extent of the financial difficulties Company B was then experiencing. Nevertheless, Defendants advised additional Temenos advisory clients to invest, without disclosing Company B's perilous financial condition and without disclosing Defendants' compensation agreement with Company B.  Taylor's failure to disclose Company B's dire financial condition to his advisory clients and prospective clients was no accident. Indeed, Taylor entered into an explicit non-disclosure agreement with Company B, as part of his arrangement with Company B, which Taylor understood would prevent him from disclosing to clients Company B's poor financial condition.  In so doing, Taylor intentionally placed Company B's and Defendants' interests above those of Defendants' advisory clients, in violation of Defendants' fiduciary duty to those clients.

**ANSWER:  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 55 as they do not identify company or investor names, and so the allegations are denied.**

56. Defendants knowingly provided outdated and inaccurate materials and information about Company B to their advisory clients and prospective clients.  Those materials did not describe Company B's dire financial condition or the many lawsuits in which Company B was involved.  By May 4, 2016, Company B 'had created a 2016 business plan, which noted several important  negative developments such as: Company  B's significant  net losses since inception;  its millions of dollars of debt; the various  legal proceedings and claims against Company B, asserting millions  of dollars of claims against it; the inexperience of Company B's management team in the telecommunications or data center industries; and Company B's inability to produce audited financial  statements, which prevented  it from filing federal and state tax returns for 2012,2013, and 2014.  Instead of providing clients with the 2016 business plan, Defendants provided advisory clients and prospective clients with Company B's 2015 business plan, which did not include those disclosures.

**ANSWER:  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 56 as they do not identify company or investor names, and so the allegations are denied.**

57. Between March 2015 and October 2015, Taylor advised and solicited an advisory client to invest in Company A and Company B.  Taylor, on multiple occasions, promised the investor, the investor's spouse, the investor's  mother, and their family's company's pension plan a return of twenty times their investment on both the Company A and Company B private placements.  At no time did Defendants disclose the extent to which Taylor expected to receive, and already had received commissions for their Company A and Company B investments.  The investor had repeatedly told Taylor that he and his family members did not have a long "time horizon" for their investment (that is, they would need access to the money in the near future). But Defendants nevertheless recommended these illiquid, long term investments, including for the investor's 85-year-old mother. On Defendants' advice, the investor and his wife proceeded to invest half of all of their investment funds, including 95% of their retirement funds, into the Company B private placement.  The investor's mother and the Company's pension plan also invested in Company B.  The pension plan also invested in Company A.  Taylor did not provide the investor and his wife with financial information regarding the companies prior to soliciting their investment, but did provide them with documents to sign in order to complete the purchases.  Defendants did not explain the documents they asked the investors to sign and failed to explain how the investment deviated from the investors' stated time horizon, but pushed the Investors to sign nevertheless.

**ANSWER:  Defendants lack sufficient information to form a belief as to the truth of the allegations in paragraph 57 as they do not identify company or investor names, and so the allegations are denied.**

58. Temenos and Taylor repeatedly solicited funds for the private placements  with emails (often to hundreds of recipients) that contained blatant misrepresentations and baseless performance forecasts, used high-pressure sales tactics, and blindly repeated claims from the private placement companies.  For example:

a) On September 30, 2016, Taylor emailed over 200 advisory clients and others falsely touting the use of Company A software by three applicants for a contract with an independent authority within the U.S. Department of Commerce, including a specified large communications company. The email represented that the investment opportunity was available for a limited time only, urging, "time is running out, so move quickly if you want to participate."  Taylor further pressed clients to refer additional prospects to Defendants, stating, "[i]f you know someone who is an accredited investor and might be interested, we can email an NDA to be signed.  We are looking for initial investments of $100k." That same day, a Company A board member who received the email alerted Taylor that it was inaccurate, because the companies mentioned in the email were not yet using Company A software.  Despite being expressly informed of the falsity of their representations, Defendants failed to correct them.

b) On August 2, 2016, Taylor emailed over 100 advisory clients and others touting the false representation that "all the big players .... are backing [Company B] with long term contracts," (specifying those "big players") and adding, "We only have available a limited number of shares for sale at the original price of $85.29 per share ... this offer will be short lived." This representation by Taylor was false and misleading.  In fact, Company B did not have contracts with at least three of the four "big players" mentioned, and Taylor took no steps to verify whether any of the contracts actually existed.

c) On December 7, 2015, Taylor emailed an advisory client stating, "[t]he good news with Company A is you are getting at least 74% return if sold late next year and more closely close to 9X or 10X if sold at $1 billion which is what I think they will sell for."   In doing so, Defendants made fraudulent omissions to the client by making it appear that there was actual analysis behind these very specific figures. In fact, Defendants had no basis for these statements.

**ANSWER:  Defendants admit the authenticity of the emails identified in the allegations set forth in paragraph 58, but deny the Plaintiff's characterization of those emails.  In further answering, Defendants state that the emails state what they state, and Defendants deny the remaining allegations in paragraph 58.**

59. Despite being required to do so in Temenos' Form ADV, Defendants did not disclose their dire financial situation to their advisory clients. In concealing this fact, Defendants fraudulently omitted both the risk that Temenos would not be able to fulfill its investment advisory agreements with its clients, and the significant undisclosed conflicts of interest in its recommending the private placement investments for which it received a substantial and immediate influx of cash.

**ANSWER: Defendants admit no disclosure of dire financial situation was made in form ADV, but Defendants deny it faced any dire financial situation as it was backed by its principal owner, and deny the remaining allegations and legal conclusions contained in paragraph 59.**

60. From approximately August 2014 to February 2017, Temenos and Taylor were in severe financial distress.  This condition interfered with Defendants' ability to provide disinterested investment advice to their advisory clients and risked threatening the continuity of Temenos' business operations, yet Defendants did not disclose their dire financial situation to advisory clients.

**ANSWER: Defendants deny the allegations in paragraph 60.**

61. During this time, Defendants had frequent overdue or unmet payrolls, unpaid commissions to Temenos employees, numerous unpaid bills including unpaid employee health insurance bills, extremely low or overdrawn bank account balances, and the possibility of power, telephone, and internet service being shut off for non-payment of bills.

**ANSWER:  Defendants lack sufficient information as to the time period in question so they cannot determine the truth or accuracy of the allegations in paragraph 61, and so they are denied.**

62. Taylor's personal finances were also strained, which in turn threatened Temenos' financial situation as Taylor frequently withdrew money from Temenos' financial institution account to pay for personal expenses.  Taylor often had difficulty paying his personal bills, including his gas, power, and private school tuition bills, but still routinely engaged in excessive personal spending.

**ANSWER:  Taylor admits he frequently drew out money from Temenos, but Defendants**

**deny the remaining allegations in paragraph 62.**

63.   Taylor and other Temenos employees explicitly tied the aggressive solicitation of clients
      for private placement investments (of which Temenos would receive a fee based on a
      percentage of the amount invested) to Defendants' dire financial situation. Taylor
      frequently discussed the need to get investors to agree to sign and return private
      placement subscription agreements in order to have the funds to make payroll and pay
      other overdue bills,   For instance:

   a) On August 27, 2014, Taylor sent an email to the president of the broker-dealer from
      which he was associated, expressing his urgent need to receive any outstanding
      commissions.  Taylor went on to say, "I am working on [a Temenos client] which will
      be at least $25k [in commissions] ... I have recommended he add another $1 million.
      The sooner the better."

   b) On October 23, 2014, Taylor wrote to another Temenos employee, "We need to get
      [Company A] finalized by Monday... I have [been scrambling] to get money today for
      health insurance $9k[.]  We have [Company A] money being sent to us[.]  We need to
      get all the money to [Company A] ...they pay 10 days after all the money and
      paperwork is in so we need to get everything finalized as soon as possible...  I guess
      we are not doing [another private issuer investment] today but we should do as soon
      as possible[.]"

   c) On March 19, 2015, when Temenos and Taylor owed $10,780 for home and office
      heating and propane, Taylor emailed advisory clients with the subject line "Company
      B new business plan Urgent" falsely stating that the price of a Company B new
      offering would be increasing by 780% on April 1 2015 but Temenos customers could
      get in at the old price of $1,000 per share if they could return signed paperwork in
      less than a week. The email worked:  between March 19, 2015 and April 8, 2015,
      Temenos clients invested approximately $1.3 million in Company B.  On April 1,
      2015, Taylor emailed the owner of his home and office heating company, "i am about
      to have money."

   d) On January 20, 2016, a Temenos employee emailed Taylor a list of "priority"
      outstanding expenses and another list of pending incoming transaction-based
      compensation payments for investments in Companies A and B.  The employee
      added, "[w]e NEED to get [a prospective investor's] paperwork signed ASAP. And I
      know you know this, but we need to get [another Temenos investment adviser
      representative] working on his folks ASAP as well-, let's see if we can try and close
      that deal sooner rather than later."

e) In April and May 2016, numerous instant message discussions between Temenos employees indicate that Temenos did not have sufficient funds at that time to meet expenses, including payroll, unless Taylor or other advisers could solicit more private placement investments.

**ANSWER: Defendants lack sufficient information to form a belief as to the truth or falsity of the allegations in paragraph 63, and so the allegations are denied.**

64. Form ADV Part 2A, Item 18.B, requires the disclosure of any financial condition that is reasonably likely to impair [Temenos'] ability to meet contractual commitments to clients.  Temenos' precarious financial condition threatened its ability to continue its business operations, and was material to clients due to the risk of investment loss resulting from the disruption or discontinuance of active investment management.  Yet Defendants concealed this fact from Temenos advisory clients.

**ANSWER:  Defendants deny the allegations in paragraph 64, except that they state that Form ADV states what it states.**

65. Defendants billed clients' management fees based on inflated asset values that should have been reduced pursuant to Temenos' asset valuation policy.  Equally important, by doing so, they lulled Temenos advisory clients into believing their investments were sound and that Taylor was functioning as a competent investment adviser.  As a result, advisory clients continued to entrust their money to Temenos and Taylor, and continued to invest additional funds in private placements that they recommended.

**ANSWER:  Defendants admit that there were several billing errors over the course of the many years they operated as an investment advisory firm, but state that any billing errors have been corrected.  As for the remaining allegations and characterizations of Defendants' conduct in Paragraph 65, such allegations and characterizations are denied.**

66. Like many investment advisers, Temenos charged its advisory clients a periodic management fee based on a percentage of the client's "assets under management," that is, the total value of assets managed by the adviser.  For certain advisory clients, Temenos included in its fee calculation (based on assets under management) the purported value of the private placement investments into which Defendants had steered those advisory clients.  Contrary to Temenos' written policies, Temenos improperly valued illiquid private placement investments at the cost of the original investment, and never adjusted the initial prices provided by the issuers as subsequent events reduced the value of the investments. In doing so, Defendants significantly overbilled advisory clients for management fees.

**ANSWER: Defendants admit they billed certain advisory clients based upon assets under management, that for some clients, their private equity holdings were held at cost and that cost number was used for billing purposes, but Defendants deny the remaining allegations in paragraph 66.**

67. Temenos' Policies and Procedures state that Temenos will commonly value a hard-to-price or illiquid security at $0, or in a manner determined "in good faith."  It didn't. Defendants instead valued each of the private placement investments at their purchase price. Defendants failed to adjust the values they attributed to their clients' investments in the private placement investments, even when negative news indicated that the value of those investments had decreased significantly.

**ANSWER:  Defendants admit that the value pricing policies and procedures state what they state and deny the remaining allegations in paragraph 67.**

68. For instance, Defendants did not decrease the value of Company B shares on their advisory clients' quarterly advisory statements (and in the calculations of management fees due) even after Defendants learned substantial negative information about Company B's financial condition in July 2015. In so doing, Defendants misled advisory clients about Company B's financial condition, about the value of advisory clients' assets under management, and about Temenos' performance as an investment adviser.

**ANSWER: Defendants admit they did not decrease private equity valuations on their books, but deny the remaining allegations in paragraph 68.**

69. In a July 2017 letter to the Commission, Temenos conceded that pricing for "private equity" and other non-publicly traded securities was not done pursuant to a fair value policy.

**ANSWER: Defendants lack sufficient information to form a belief as to the truth or accuracy of the allegations in paragraph 69, and so the allegations are denied.**

70. Temenos' standard investment advisory agreement provided that advisory clients would be charged advisory fees based on assets held at certain identified custodians.  It did not, however, state that advisory fees would be charged on private placement assets which were not held by those custodians.  Temenos nevertheless billed its advisory clients on those assets.

**ANSWER:  Defendants deny the allegations in paragraph 70.**

71. Also, in multiple instances Defendants overbilled advisory clients. For instance, between the third quarter of 2011 and the fourth quarter of 2017, Defendants overbilled one client by approximately $52,000.   Another client was billed on one of her private company investments as if she had made a $200,000 private placement investment, when she had actually made only a $100,000 investment.  That same client was billed on another of her private company investments as if she had made a $150,000 investment when she had only made a $100,000 investment.

**ANSWER:  Defendants lack sufficient information to form a belief as to the truth and accuracy of the allegations in paragraph 71, and so the allegations are denied.**

72. In another instance, Defendants were unresponsive to an advisory client's requests to correct Defendants overbilling, while simultaneously soliciting that client for additional private placement investments. On February 19, 2014, a Temenos advisory client emailed Taylor reminding him that he had not responded to the client's earlier inquiry regarding whether an advisory fee had been improperly calculated.  Taylor responded, "Ok I will look at it tomorrow and get back to you after school [sic]."  On February 24, 2014, the client followed up, "[n]ot good."  On February 25, 2014, Taylor replied, but did not answer the client's concern and wrote that he was "backed up" because of power outages and computer server updates. During the same period, however, Taylor solicited the client for an additional private placement investment.  On March 6, 2014, the client wrote that he had been waiting two months for an answer to the overbilling issue and that Taylor had been unresponsive about both the billing and the client's account-related requests.  The following day, Taylor finally admitted that the client's account had been

29

overbilled by more than $1,400.  Instead of refunding that money, Taylor wrote that he would reduce the next quarter's billing, which was another four weeks away.  And, Taylor took that opportunity to solicit the client to make another private placement investment.  A month later, on April 2, 2014, the client followed up, stating via email, "[t]he I" qtr. Adjustment has not been made to date..."  Taylor replied the following day that he would manually make the fee adjustment.

**ANSWER:  Defendants lack sufficient information to form a belief as to the truth and accuracy of the allegations in paragraph 72, and so the allegations are denied.**

73. Defendants generally told advisory clients that investments in Company B and the other private placement companies were illiquid, that is, that they could not be sold and that clients would need to wait for a liquidity event (such as a buy-out or a public sale of stock) before they could receive back their investment money and any return on their investment.

**ANSWER:   Defendants admit clients holding private equity were told their investments were illiquid.  In further answering, Defendants lack sufficient information to form a belief as to the truth and accuracy of the remaining allegations in paragraph 73, and so the allegations are denied.**

74. For instance, on October 24, 2016, a Temenos advisory client asked Taylor to redeem the client's Company B shares.  Taylor responded that he could not get the shares redeemed and that the Company B shares were an illiquid investment.

**ANSWER: Defendants lack sufficient information to form a belief as to the truth and accuracy of the allegations in paragraph 74, and so the allegations are denied.**

75. Notwithstanding these representations, Defendants arranged for two Temenos advisory clients, including a trust that owns 4% of Temenos and for which Taylor served as a trustee, to liquidate their Company B investments early. Defendants arranged for an advisory client, his family, and his family company's pension plan (in September 2016) and for the trust Taylor controlled and which owned a small percentage of Temenos (in December 2015 and March 2016) to liquidate their Company B investments and receive their investment money back. Defendants convinced other advisory clients to buy out the investments of the family and the trust. But Defendants failed to disclose this preferential treatment to any of their other advisory clients, and, in fact, refused other advisory clients' requests to liquidate their private securities holdings. In doing so, Defendants violated their fiduciary duty to their advisory clients.

**ANSWER: Defendants lack sufficient information to form a belief as to the truth and accuracy of the allegations in paragraph 75, and so the allegations are denied.**

76. The Commission repeats and incorporates by reference the allegations in paragraphs I through 75 above as if set forth fully herein.

**ANSWER:  Defendants repeat and incorporate by reference their responses to the allegations contained in paragraphs 1-75 as if set forth fully herein.**

77. At all relevant times, Temenos and Taylor were "investment advisers" within the meaning of Section 202(a)(ll) of the Advisers Act [15 U.S.C. §80b-2(a)(ll)]. Both Temenos and Taylor received compensation in the form of money from clients as compensation for investment advice, and both were in the business of providing investment advice concerning securities, for compensation. And, Taylor was an "investment adviser" by virtue of his ownership, management, and control of Temenos.

**ANSWER:  Paragraph 77 sets forth legal argument so no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 77.**

78. As set forth above, Temenos and Taylor employed devices, schemes, or artifices to defraud clients and prospective clients by:

a)  recommending their clients invest in unsuitable, high-risk private placement investments;

b)  failing to perform adequate due diligence on those investments and ignoring red flags about the companies in which they recommended clients invest;

31

    c) making material misrepresentations and failing to disclose material information to clients and prospective clients concerning the potential risks, returns, and value of those private placements, the financial condition of the issuers, and Temenos' own failing financial condition;

    d) making material misrepresentations and failing to disclose material information to clients and prospective clients about Taylor's and Temenos' compensation arrangements and other connections to the private companies, and the conflicts of interest those arrangements created in their investment advice;

    e) acting as unregistered broker-dealers, when they were supposed to be acting as investment advisers;

    f) failing to implement their written policies and procedures regarding the valuation of the private placement investments and overbilling clients for management fees; and,

    g) giving preferential treatment to some clients over others, including clients affiliated with the Defendants, without disclosing that preferential treatment to clients.

**ANSWER: Defendants deny the allegations in paragraph 78.**

79. Temenos and Taylor, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly have employed or are employing devices, schemes, or artifices to defraud a client or prospective client.

**ANSWER: Defendants deny the allegations in paragraph 79.**

80. As a result, Temenos and Taylor have violated and, unless enjoined, will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. §80b-6(1)].

**ANSWER: Defendants deny the allegations in paragraph 80.**

81. The Commission repeats and incorporates by reference the allegations in paragraphs I through 80 above as if set forth fully herein.

**ANSWER: Defendants repeat and incorporate by reference their responses to the**

**allegations contained in paragraphs 1-80 as if set forth fully herein.**

82. At all relevant times, Temenos and Taylor were "investment advisers" within the meaning of Section 202(a)(ll) of the Advisers Act [15 U.S.C. §80b-2(a)(ll)]. Taylor was an "investment adviser" by virtue of his ownership, management and control of Temenos. Both Temenos and Taylor received compensation in the form of money from clients as compensation for investment advice, and both were in the business of providing investment advice concerning securities, for compensation.

**ANSWER:  Paragraph 82 consists of legal argument or a statement of law to which no**

**response is required.  To the extent a response is required, the allegations are denied.**

83. As set forth above, Temenos and Taylor made materially false and misleading statements and omissions to their investment advisory clients and engaged in transactions, practices, or courses of business which operated as a fraud or deceit on clients and/or prospective clients by:
   a)  recommending their clients invest in unsuitable, high-risk private placement investments;
   b)  failing to perform adequate due diligence on those investments and ignoring red flags about the companies in which they recommended clients invest;
   c)  making material misrepresentations and failing to disclose material information to clients and prospective clients concerning the potential risks, returns, and value of those private placements, the financial condition of the issuers, and Temenos' own failing financial condition;
   d)  making material misrepresentations and failing to disclose material information to clients and prospective clients about Taylor's and Temenos' compensation arrangements and other connections to the private companies, and the conflicts of interest those arrangements created in their investment advice;
   e)  acting as unregistered broker-dealers, when they were supposed to be acting as investment advisers;
   f)  failing to implement their own written policies and procedures regarding the valuation of the private placement investments and overbilling clients for management fees; and,
   g)  giving preferential treatment to some clients over others, including clients affiliated with the Defendants, without disclosing that preferential treatment to clients.

**ANSWER:  Defendants deny the allegations in paragraph 83.**

84. Temenos and Taylor, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.  As a result, Temenos and Taylor have violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

**ANSWER:  Defendants deny the allegations in paragraph 84.**

85. As a result, Temenos and Taylor have violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

**ANSWER:  Defendants deny the allegations in paragraph 85.**

86. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 85 above as if set forth fully herein.

**ANSWER: Defendants repeat and incorporate by reference their responses to the**

**allegations contained in paragraphs 1-85 as if set forth fully herein.**

87. Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder provide that it shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business for any registered investment adviser, directly or indirectly, to fail to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules adopted thereunder.

**ANSWER: Paragraph 87 sets forth legal argument or a statement of the law to which no**

**response is required.  To the extent a response is required, the allegations are denied.**

88. Temenos adopted but failed to implement its written policy and procedure concerning the valuation of investments in non-public companies.  Temenos' Policies and Procedures stated that Temenos would value hard-to-price and/or illiquid securities at $0 or in a manner determined "in good faith." Instead, Temenos and Taylor valued private placement investment securities at purchase value, and did not adjust that value even after receiving information indicating the securities were worth much less.

**ANSWER: Defendants deny the allegations in paragraph 88.**

89. By failing to implement Temenos' adopted illiquid securities valuation policy, Temenos and Taylor overbilled clients for management fees and misled clients about the status of their private placement investments, the value of their assets under management, and Temenos' performance as an investment adviser.

**ANSWER:  Defendants deny the allegations in paragraph 89.**

90. As a result, Temenos violated and, unless enjoined, will violate Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-7 [17 C.P.R. §275.206(4)-7]. Taylor aided and abetted Temenos' violation of those provisions.

**ANSWER:  Defendants deny the allegations in paragraph 90.**

91. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 90 above as if set forth fully herein.

**ANSWER: Defendants repeat and incorporate by reference their responses to the allegations contained in paragraphs 1-90 as if set forth fully herein.**

92. By engaging in the conduct above, Temenos and Taylor, directly or indirectly, singly or in concert with others, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without being registered as a broker or dealer or associated with a registered broker or dealer in accordance with Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

**ANSWER:  Defendants deny the allegations in paragraph 92.**

93. As part of, and in furtherance of the violative conduct, Temenos and Taylor regularly promoted securities to investors and advised investors about the merits of investing in those securities. They also directly or indirectly received compensation based on their successful promotion efforts that resulted in purchases or sales of securities.

**ANSWER:  Defendants deny the allegations in paragraph 93.**

94. As a result, Temenos and Taylor, acting directly or indirectly, and singly or in concert with others, violated, and unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. §78o(a)].

**ANSWER:  Defendants deny the allegations in paragraph 94.**

**WHEREFORE**, the Defendants respectfully request this honorable Court dismiss the Complaint with prejudice, and grant such other relief the Court deems just and equitable.  In further answering, Defendants state they acted in good faith in determining that Temenos would carry private equity, in most if not all cases, at cost and all clients were so informed of that decision.

## AFFIRMATIVE DEFENSES

As and for their Affirmative Defenses, the defendants, Temenos Advisory, Inc., and George L. Taylor, allege:

### FIRST AFFIRMATIVE DEFENSE

The causes of action set forth in the Complaint are barred by applicable statutes of limitation and repose.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff has not pled fraud with particularity, and its causes of action therefore cannot be sustained and should be dismissed.

### THIRD AFFIRMATIVE DEFENSE

Defendants did not act with scienter and, therefore, any claims brought under the antifraud provisions of the federal securities laws, particularly the Investment Advisers Act of 1940, must be dismissed.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrines of waiver, estoppel, unclean hands, and laches.

### FIFTH AFFIRMATIVE DEFENSE

Rescissionary damages are not proper in this case.

### SIXTH AFFIRMATIVE DEFENSE

At all relevant times, George Taylor was properly licensed to sell securities and did

not act as an unregistered broker-dealer.

### SEVENTH AFFIRMATIVE DEFENSE

Any and all omissions or misrepresentations alleged by the Plaintiff were not material

as a matter of fact and/or law.

### EIGHTH AFFIRMATIVE DEFENSE

Temenos and Taylor did not act in a manner that was willful, malicious, in bad faith,

or motivated by ill-will or fraud.

### NINTH AFFIRMATIVE DEFENSE

The claims at issue are barred in their entirety by the "bespeaks caution doctrine." *See*

*In re Worlds of Wonder Securities Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994).

### TENTH AFFIRMATIVE DEFENSE

To the extent there were any misrepresentations in the offering materials, Temenos

and Taylor are not responsible because, at all times, they acted in good faith.

37

## **DEMAND FOR JURY TRIAL**

Defendants hereby demand a jury trial.

Respectfully submitted,

**Temenos Advisory, Inc., and
George L. Taylor,**
By and through their legal counsel

//s// James T. Cowdery (ct05103)
James Cowdery, Esq. (ct05103)
John P. D'Ambrosio, Esq. (ct29101)
Cowdery & Murphy, LLC
280 Trumbull Street, 22nd Floor
Hartford, CT 06103-3599
(860) 278-5555 (Tel.)
(860) 249-0012 (Fax)
jcowdery@cowderymurphy.com
jdambrosio@cowderymurphy.com

Steven N. Fuller, Esq.
*Pro Hac Vice* Application Pending
Markun Zusman Freniere Compton, LLP
40 Grove Street/Suite 275
Wellesley, MA 02482
sfuller@mzclaw.com

September 17, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

//s// John P. D'Ambrosio (ct29101)
John P. D'Ambrosio (ct29101)